# EXHIBIT A

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JERRY HERING, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civ. Action No. 1:15-cv-02440-JEJ |
| Plaintiff, ) ) | <u>CLASS ACTION</u> |
| vs. ) ) | FIRST AMENDED DIRECT SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 |
| RITE AID CORPORATION, JOHN T. STANDLEY, DAVID R. JESSICK, JOSEPH B. ANDERSON, JR., BRUCE G. BODAKEN, KEVIN E. LOFTON, MYRTLE S. POTTER, MICHAEL N. REGAN, FRANK A. SAVAGE, MARCY SYMS, WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA and GEORGE R. FAIRWEATHER, ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |
| _____ ) | <u>DEMAND FOR JURY TRIAL</u> |

1311192_1

Lead Plaintiff Jerry Hering ("Plaintiff"), by and through undersigned counsel, for his First Amended Direct Shareholder Class Action Complaint for Violations of the Securities Exchange Act of 1934 (the "1934 Act") against the herein-named Defendants, alleges upon information and belief, based upon, *inter alia*, the investigation of counsel, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this direct shareholder class action individually and on behalf of all purchasers of Rite Aid Corporation ("Rite Aid" or the "Company") common stock between October 27, 2015 and June 28, 2017, inclusive (the "Class Period"), and against Rite Aid, certain Rite Aid executive officers named herein, Walgreens Boots Alliance, Inc. ("Walgreens" or "WBA"), and certain Walgreens executive officers named herein (collectively, "Defendants"), seeking to recover damages caused by Defendants' dissemination of materially false and misleading statements in violation of §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in connection with the proposed sale of Rite Aid to Walgreens, which was ultimately terminated due to Defendants' failure to obtain regulatory approval.

2.      On October 27, 2015, Rite Aid and Walgreens jointly announced an Agreement and Plan of Merger (the "Original Merger Agreement") pursuant to which

- 1 -

Walgreens would purchase Rite Aid (the "Original Merger"), with Rite Aid shareholders receiving $9.00 per share in cash (the "Original Merger Consideration").

3.      The Original Merger Consideration did not adequately value Rite Aid's future growth potential.   Although Rite Aid shareholders would not be fairly compensated, the Rite Aid board of directors (the "Rite Aid Board") ensured to extract personal compensation benefits and other favorable deal terms for themselves and other Rite Aid insiders.   For example, under the Original Merger Agreement, Rite Aid's directors were permitted to rollover most of their options and all of their restricted stock and performance units into Walgreens stock, the value of which ranged from just over $120,000 to $25 million for directors, with Defendant John T. Standley ("Standley"), the Company's Chief Executive Officer ("CEO") and Chairman of the Board, receiving the largest share.   And because the Original Merger Consideration did not value Rite Aid's future growth potential, Walgreens stood to acquire the Company at a bargain.

4.      Defendants knew the Original Merger faced regulatory risks, and despite knowledge of those risks, acted to further their own self-interests by attempting to obtain stockholder approval of the Original Merger through the issuance of a false and misleading proxy statement.   The full extent of the regulatory risks inherent in the Original Merger were known only to Defendants, who continuously misled investors regarding the likelihood that the Original Merger would obtain

- 2 -

regulatory approval, as well as the detriment that would result in the event the Original Merger failed.

5.      For example, a Rite Aid filing with the SEC in October 2015 stated that Rite Aid did "*not believe the combination should cause regulatory concern*," and that if any antitrust issues did arise, they could be adequately addressed through store divestitures.  Defendants then filed a definitive proxy statement with the SEC on December 21, 2015 (the "2015 Proxy"), which represented the purported "*fact*" that the Original Merger Consideration "*will provide certainty of value*" for Rite Aid shareholders "*while eliminating long-term business and execution risk*." Importantly, Defendants also represented that Walgreens, and not Rite Aid, was "assuming the risks" related to antitrust approval of the deal, "including [Walgreens'] *commitment* to sell up to 1,000 stores" if required by federal regulators.

6.      Defendants continued to mislead investors regarding the regulatory risks during the pendency of the review process.  For example, on a January 7, 2016 Walgreens earnings call for its first fiscal quarter of 2016, Defendant Stefano Pessina ("Pessina"), Walgreens' CEO, assured investors that "*this transaction is progressing as we expected and planned*," and characterized a second request for information by the FTC as "*a standard part* of the regulatory process in connection with the FTC's review."  Pessina further stated that a "highly experienced integration team" had already "been up and running since the end of November" and was "*now well*

- 3 -

*underway on preliminary planning work*" related to combining the two companies. Pessina also confirmed his prior statements that the number of store divestitures needed to obtain FTC approval would be *less than 500*, telling a securities analyst on the call: "*We don't have any reason to change our view. . . . We are still confident that this will go through in the terms that we have anticipated.*"

7.      On January 27, 2016, at Walgreens' annual shareholders meeting, Pessina stated in his prepared remarks that the regulatory review of the Original Merger was "*proceeding as we had anticipated* and we continue to expect the transaction to complete at some point in the second half of *this calendar year*."

8.      On April 5, 2016, Walgreens held an earnings call for its second fiscal quarter of 2016.  In his prepared remarks, Pessina stated: "Of course, *our agreement to acquire Rite Aid is continuing as we expect, with the regulatory approval process progressing in line with the timetable we had expected.*"  During the Q&A session with analysts, Pessina insisted that "*[n]othing has changed*" from earlier pronouncements and that "[t]he process is developing and an absolute normal way. . . . *But it's nothing atypical, exactly online with what we were expecting*."

9.      On July 6, 2016, Walgreens held an earnings call for its third fiscal quarter of 2016 during which Pessina reiterated that the "*proposed acquisition of Rite-Aid is progressing as planned*" and that the "integration team is *continuing its*

- 4 -

*work on preliminary planning*."  Later on the call, in response to an analyst question regarding the expected number of store divestitures, Pessina responded:

> *We still believe that our initial estimate is correct*.  We still believe that, at the end, we will stay in the range of the stores that we initially indicated, around 500.  *And time-wise, we still believe that we will be able to really do the deal, finish the deal, by the end of this calendar year, as we said.  So, by December, we believe that everything will be done*.

10.     As the October 27, 2016 merger agreement end date under the Original Merger Agreement approached, and the deal had still not received regulatory approval, Defendants continued to issue misleading statements regarding the Original Merger in an effort to defend the deal and rebut criticism of the deal's viability, which threatened to tarnish Pessina's strong deal-making reputation.

11.     On September 8, 2016, Walgreens issued a press release providing an update on the Original Merger.  The release stated that Walgreens was actively engaged with the FTC and that, as a result of "progress of these discussions with the FTC staff[,]" it was "exploring potential divestiture remedies."  The release downplayed the significance of the "divestiture remedies," stating simply that, "[i]n order to *expedite that process*, . . . the *most likely outcome* will be that the parties will be required to divest more than the 500 stores previously communicated, *but still continues to expect that fewer than 1,000 stores will be required to be divested.*"  The release further stated that "the company continues to believe that the acquisition

will ***close in the second half of calendar 2016***." Thus, Defendants led investors and the market to believe that the Original Merger was close to closing within the parameters set forth in the Original Merger Agreement.

12.    Then, on October 20, 2016, Rite Aid and Walgreens issued a joint press release announcing they had extended the merger agreement end date under the Original Merger Agreement from October 27, 2016 to January 27, 2017. That same day, Walgreens held an earnings call for its fourth fiscal quarter and full fiscal year of 2016. In his prepared remarks, Defendant George R. Fairweather ("Fairweather"), Walgreens' Global Chief Financial Officer ("CFO"), now assured investors that "***the most likely outcome*** will be that the parties will be required to divest ***between 500 and 1,000 stores***" and that Walgreens "will be able to execute agreements to divest these stores to potential buyers pending FTC approval, ***by the end of calendar year 2016***" – *i.e.*, within the original timeframe – although the Original Merger was now expected to close in early calendar 2017. Walgreens also included Rite Aid accretion from the Original Merger in its fiscal 2017 guidance, which Pessina stated was appropriate because he was "***as confident as we were before***" that the deal would close under the terms of the Original Merger Agreement based on Walgreens' discussions with the FTC and Walgreens' own internal analyses.

13.    On November 8, 2016, Walgreens presented at the Credit Suisse Healthcare Conference where Pessina rejected any notion that the Original Merger

- 6 -

had encountered regulatory turbulence based on Defendants' purported insider knowledge obtained during the review process: "*[W]e have a different opinion than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of*. . . . So, just to reassure you, if we say that we are confident, it is because *what we know makes us very confident*."

14.     On November 15, 2016, Walgreens participated in the Morgan Stanley Consumer Conference where, Alex Gourlay ("Gourlay"), Walgreens' Co-Chief Operating Officer ("COO"), rebutted any notion that the Original Merger had generated any regulatory concern and reiterated that Defendants' confidence was as strong as it was on "day one" when the transaction was announced: "*We remain, as we did from day one, confident about [doing] strategic deal for us*."

15.     On November 17, 2016, Walgreens presented at the Jefferies Healthcare Conference.  Fairweather again reassured investors that "*[w]e are very clear*" that the deal would be approved well under the 1,000-store divestiture cap provided for in the Original Merger Agreement.

16.     On January 5, 2017, Walgreens held an earnings call for its first fiscal quarter of 2017.  Pessina reiterated that the FTC review process allowed him to "*remain as convinced as ever* of the strategic benefits of the proposed Rite Aid transaction," and Fairweather added that the companies "are still working towards a *close of the acquisition in the early part of this calendar year*."  In truth, Walgreens

- 7 -

and Rite Aid had already received notice by this time that antitrust regulators had significant concerns about the Original Merger and its potential anti-competitive effects in the retail pharmacy market, a material fact that Defendants concealed from investors. Indeed, by January 6, 2017, as a result of prior discussions with the FTC, Rite Aid's attorneys had already privately concluded that "the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date."

17.     The truth behind Defendants' false and misleading statements began leaking to the public on January 20, 2017 – barely two weeks after Pessina had expressed his "confiden[ce]" that the Original Merger would be approved as structured – when *Bloomberg* reported in an article entitled, "Walgreens Faces U.S. Antitrust Concerns Over Rite Aid Fix," that FTC regulators were unlikely to approve the deal. The article relayed the concerns of FTC officials that "Walgreens's proposal to sell 865 drugstores . . . doesn't go far enough to preserve competition that would be lost in the tie-up." On this news, the price of Rite Aid stock fell by $1.70 per share, or 20%, over two trading days to close at $6.90 per share on unusually high volume.

18.     Then, on January 30, 2017, Defendants made an announcement that shocked the market: Rite Aid and Walgreens had entered into a new merger agreement (the "Revised Merger Agreement") for a new deal (the "Revised Merger") and cut the Original Merger Consideration from $9.00 per share to between $6.50 to

$7.00 per share (the "Reduced Merger Consideration"), representing a destruction to Rite Aid shareholder value of over $2 billion.  This was a dramatic capitulation in light of Walgreens' stated commitment to bear the antitrust risks in the Original Merger.

19.     Under the terms of the Revised Merger Agreement, Rite Aid shareholders stood to receive $7.00 per share – 22% less consideration than the Original Merger Consideration – if Walgreens were required to divest the same number of stores (1,000) that it had already committed to divest under the Original Merger Agreement.  Rite Aid shareholders would receive even less consideration ($6.50 per share) if Walgreens were required to divest 1,200 stores.  Thus, the Rite Aid Board agreed to accept substantially reduced cash payments for Rite Aid shareholders for essentially nothing in return, which belied Defendants' prior representation of "*fact*" in the 2015 Proxy that the Original Merger Consideration "*will provide certainty of value*" for Rite Aid shareholders "*while eliminating long-term business and execution risk*," as well as Defendants' assurances that the "*most likely outcome* will be that the parties will be required to divest *between 500 and 1,000 stores*" to obtain approval of the Original Merger.  Rite Aid management, however, ensured that the personal benefits payable to the Rite Aid Board and other Rite Aid insiders, under the Original Merger Agreement would remain largely intact.

- 9 -

20.     Defendants continued to issue misleading statements to the market regarding the regulatory risks inherent in the Revised Merger.  During an April 5, 2017 earnings call with investors, Pessina touted Walgreens' announcement of a $1 billion share repurchase program that would return value to Walgreens shareholders "without undermining our intention to [profitably] deleverage the company following the closing of the proposed Rite Aid acquisition."  Pessina added: "I am still optimistic that we will bring this deal to a successful conclusion" and that "*[w]e believe that we can [certify compliance] in the coming weeks*[.]"  Pessina assured investors that he was "still positive on this deal" and stated, "I believe that we have a strong argument . . . to defend this deal."  He concluded by reassuring investors that the Revised Merger would be more likely to satisfy regulators: "The changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements while *allowing us the ability to address any reasonable demand* that may be made of us in obtaining regulatory approval."

21.     Just over two months later, on June 29, 2017, Defendants stunned the market once again by announcing that they had terminated the Revised Merger Agreement and, instead, entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") under which Walgreens would simply purchase 2,186 Rite Aid stores, with Rite Aid continuing to operate as an independent company.  When

- 10 -

commenting on the Asset Purchase Agreement, Pessina stated, "I view this deal as being more attractive than the transaction it replaces."

22.     As a result of Defendants' materially false and misleading statements, Rite Aid stock traded at artificially inflated prices during the Class Period.  In fact, Rite Aid filed on March 3, 2017 – following review, editing, and approval by Walgreens – a preliminary proxy statement related to the Revised Merger Agreement (the "2017 Proxy"), in which Defendants conceded that Rite Aid stock traded at artificially inflated levels, at a minimum, between October 27, 2015 and January 30, 2017:

> *Rite Aid believes that the January 27, 2017 stock price is not an accurate reflection of the value of Rite Aid because such stock price reflected market expectations of the likelihood that the merger would occur on the terms of the original merger agreement and did not reflect the value of Rite Aid as an independent company*.

23.     After the true facts underlying Defendants' false and misleading statements hit the market, Rite Aid's stock price plummeted by over 54% from its Class Period high.

## PARTIES

### *Plaintiff*

24.     Plaintiff Jerry Hering is, and at all relevant times was, a shareholder of Rite Aid and purchased Rite Aid common stock during the Class Period, as described

in the Certification attached hereto and incorporated herein by reference, and thereby suffered damages caused by Defendants' actions alleged herein.

### The Rite Aid Defendants

25.     Defendant Rite Aid Corporation is a Delaware corporation with its corporate headquarters located at 30 Hunter Lane, Camp Hill, Pennsylvania 17011. Rite Aid is a retail drugstore chain that sells prescription drugs and a range of other merchandise referred to as "front-end products." The Company's stock is publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "RAD."

26.     Defendant John T. Standley is, and at all relevant times was, Chairman of the Board and CEO of Rite Aid. Standley also previously served as the Company's President (September 2008 until June 2013), COO (September 2008 until June 2010), and Senior Executive Vice President and CFO (September 2000 to June 2002). Standley participated on Rite Aid earnings calls and, by virtue of his position as the Company's most senior executive officer, had the authority and ability to correct any false or misleading statements made about the Company's business, operations or prospects, and ultimate control over the contents of the information provided to investors and the market on the Company's behalf.

27.     Defendant David R. Jessick ("Jessick") is, and at all relevant times was, a director of Rite Aid. Jessick also previously served as a consultant to Rite Aid's CEO and senior financial staff (July 2002 until February 2005), and as Senior

- 12 -

Executive Vice President and Chief Administrative Officer of Rite Aid (December 1999 to July 2002).

28.     Defendant Joseph B. Anderson, Jr. is, and at all relevant times was, a director of Rite Aid.

29.     Defendant Bruce G. Bodaken is, and at all relevant times was, a director of Rite Aid.

30.     Defendant Kevin E. Lofton is, and at all relevant times was, a director of Rite Aid.

31.     Defendant Myrtle S. Potter is, and at all relevant times was, a director of Rite Aid.

32.     Defendant Michael N. Regan is, and at all relevant times was, a director of Rite Aid.

33.     Defendant Frank A. Savage is, and at all relevant times was, a director of Rite Aid.

34.     Defendant Marcy Syms is, and at all relevant times was, a director of Rite Aid.

35.     The Defendants identified in ¶¶26-34, above, are at times collectively referred to herein as the Rite Aid Board.  The Rite Aid Board and Rite Aid are collectively referred to herein as the "Rite Aid Defendants."

- 13 -

### *The Walgreens Defendants*

36.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its corporate headquarters located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreens is a global pharmacy-led health and well-being enterprise that was created through the combination of Walgreens and Alliance Boots in December 2014. The Company's stock is publicly traded on the NASDAQ Exchange under the ticker symbol "WBA."

37.     Defendant Stefano Pessina is, and at all relevant times was, the CEO and Executive Vice Chairman of Walgreens. Pessina participated on Walgreens earnings calls and, by virtue of his position as the company's most senior executive officer, had the authority and ability to correct any false or misleading statements made about the company's business, operations or prospects, and ultimate control over the contents of the information provided to investors and the market on the company's behalf.

38.     Defendant George R. Fairweather is, and at all relevant times was, the Executive Vice President and Global CFO of Walgreens.

39.     The Defendants identified in ¶¶36-38, above, are at times collectively referred to herein as the "Walgreens Defendants."

40.     The Defendants named in ¶¶26-34 and ¶¶37-38, above, are at times collectively referred to herein as the "Individual Defendants."

- 14 -

1311192_1

41.     The Individual Defendants are liable for the false and misleading statements pleaded herein because, through their positions as senior executives and/or board members of Rite Aid and/or Walgreens, possessed the power and ultimate authority to control the contents of these companies' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions within Rite Aid and Walgreens, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act because the claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a).  Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).

43.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is an individual, corporation, or partnership that has sufficient

- 15 -

minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## BACKGROUND AND CHRONOLOGY OF THE FAILED MERGERS

44.      Rite Aid is a retail drugstore chain that sells prescription drugs and a range of "front-end products."  Walgreens is a global pharmacy-led health and well-being enterprise created through a combination of Walgreens and Alliance Boots in December 2014.

45.      Sometime in January 2015, Rite Aid management requested a meeting with Walgreens to discuss a potential business combination.  On May 8, 2015, Walgreens submitted a preliminary indication of interest, proposing to purchase Rite Aid for $9.00 per share.

46.      On July 15, 2015, "Party D," which had been engaged in discussions regarding a potential stock-for-stock merger of equals with Rite Aid since early 2014, submitted its own preliminary indication of interest.  Party D submitted a revised preliminary indication of interest on August 10, 2015.

47.      The following day, August 11, 2015, Walgreens submitted a counter-proposal to purchase Rite Aid for $10.00 per share.  Despite Party D's continued interest in Rite Aid, the Rite Aid Board ceded to Walgreens' demand to enter into a "Notification Agreement," which the Rite Aid Board treated as a *de facto* exclusivity agreement.  Indeed, on August 18, 2015, the same day they entered into the

Notification Agreement, the Rite Aid Board terminated discussions with Party D. The following day, the Rite Aid Board refused to provide non-public Rite Aid information to "Party I," another potential buyer that had previously expressed interest in the Company and requested that the parties enter into a confidentiality agreement to explore a potential business combination transaction.

48.     With Rite Aid now in a weakened bargaining position, Walgreens began demanding beneficial deal terms for itself from a position of strength. First, Walgreens lowered its proposed purchase price (which purportedly supported the Rite Aid Board's decision to terminate discussions with Party D) from $10.00 to $9.00 per share, which was equal to the initial Walgreens proposal that the Rite Aid Board had previously rejected. Walgreens then demanded that it be permitted to engage in transactions with other entities during the regulatory review process for the deal and that Rite Aid's ability to borrow under its existing credit facilities be limited. The Rite Aid Board agreed to these deal terms during discussions held between October 19 and October 21, 2015.

49.     On October 27, 2015, Rite Aid and Walgreens jointly announced they had entered into the Original Merger Agreement, pursuant to which Walgreens would purchase Rite Aid for $9.00 per share in cash. On December 21, 2015, Defendants filed the 2015 Proxy to solicit shareholder approval of the Original Merger, and on February 4, 2016, Rite Aid announced that its shareholders voted to approve the

- 17 -

adoption of the Original Merger Agreement.  But the ongoing regulatory review process prevented the Original Merger from closing.

50.      As noted, under the Original Merger Agreement, the Rite Aid Board extracted favorable personal compensation benefits for themselves and other Rite Aid insiders.  For example, under the Original Merger Agreement, Rite Aid's senior officers and directors were permitted to rollover most of their options and all of their restricted stock and performance units into Walgreens shares, the value of which ranged from just over $120,000 to $2.8 million for directors and over $25 million for Standley, as demonstrated in the following table:

| | Rollover Options | Rollover Stock Awards | | | | |
| | Value ($) | Value of Restricted Stock ($) | Value of Performance Units ($) | RSUs (#) | Value of RSUs ($) | Total Value ($) |
| --- | --- | --- | --- | --- | --- | --- |
| *Directors* | | | | | | |
| Anderson, Jr. | -- | 154,503 | -- | 299,746 | 2,697,714 | 2,697,714 |
| Bodaken | -- | 154,503 | -- | 31,250 | 281,250 | 435,753 |
| Jessick | -- | 154,503 | -- | 299,746 | 2,697,714 | 2,852,217 |
| Lofton | -- | 154,503 | -- | 11,048 | 99,432 | 253,935 |
| Potter | -- | 154,503 | -- | 8,953 | 80,577 | 235,080 |
| Regan | -- | | -- | 299,746 | 2,697,714 | 2,697,714 |
| Savage | -- | | -- | 13,825 | 124,425 | 124,425 |
| Syms | -- | | -- | 299,746 | 2,697,714 | 2,697,714 |
| Standley | 6,728,728 | 3,575,691 | 14,985,666 | | | 25,290,085 |

51.      The full extent of the antitrust risk inherent in the Original Merger was known only to Defendants who, as detailed below, continuously misled investors

regarding those facts and the likelihood that the Original Merger would receive regulatory approval as then-constituted under the Original Merger Agreement, as well as the detriment that would result in the event the Original Merger was not approved.

52.     On January 6, 2017, the Rite Aid Board met to discuss recent developments in the FTC review process, discussions with Walgreens, and Rite Aid's financial results.  The Rite Aid Board did not discuss a potential revision in price, nor did it discuss any specific amendment to the Original Merger Agreement (beyond an expected extension after January 27, 2017).  Rite Aid management continued to meet with Walgreens management throughout January 2017.

53.     On January 22 and January 23, 2017, Rite Aid management met with Walgreens management to discuss the possibility of amending the Original Merger Agreement.  At those meetings, the parties did not specifically discuss reducing the Original Merger Consideration.  On January 23, 2017, Walgreens sent a proposed amendment to the Original Merger Agreement to Rite Aid, which, again, did not include a reduction to the Original Merger Consideration.  The Rite Aid Board did not meet at that point to discuss Walgreens' initial proposed revisions.

54.     On January 24, 2017, Rite Aid management and Walgreens management held an in-person meeting in New York.  For the first time, despite having assumed the antitrust risks, Walgreens stated that it would not agree to a long-term extension of the Original Merger without a decrease in purchase price.

- 19 -

Walgreens offered a number of reasons, including, *inter alia*, "Rite Aid's reduced Adjusted EBITDA since entering into the original merger agreement" and "the reduction in WBA's internal rate of return compared to the rate of return contemplated at the time WBA entered into the original merger agreement." But these justifications were mere pretext given that Defendants had expected that merger-related distractions might negatively impact Rite Aid's financial performance, as noted in Rite Aid's Form 10-K annual report for the fiscal year ended February 27, 2016: "The pendency of the Merger may cause disruptions in our business, which could have an adverse effect on our business, financial condition or results of operations."

55.     Upon hearing that Walgreens "might" attempt to reduce the deal price, Rite Aid management did not call out Walgreens on its dubious justification. Nor did Rite Aid management seek out a fully vetted valuation analysis or go back to the Rite Aid Board to seek further instruction. Instead, Rite Aid management immediately capitulated. According to the 2017 Proxy, at the very same meeting where Walgreens stated that a reduced price range "might be around $7.00 per share," Rite Aid management "proposed, subject to the approval of [the Rite Aid Board], a price of $7.50 to $8.25 per share" and other revised antitrust terms.

56.     While further negotiations would take place, any expressed willingness to move off of the negotiated Original Merger Consideration, particularly where Walgreens had purportedly agreed to bear the antitrust risk, was significant. Indeed,

- 20 -

the Rite Aid Board discussed Walgreens' proposal later that evening and conceded that management's move was premature, noting that "additional analysis" was required to even contemplate a reduction in price. But the damage was done. Walgreens pushed with increased leverage and, after a series of counter-offers, the Reduced Merger Consideration was cut down to the $6.50 to $7.00 per share range, culminating in the Revised Merger Agreement on January 29, 2017.

57. Under the Revised Merger Agreement, the merger consideration to be paid to Rite Aid shareholders would drop from $9.00 per share to $7.00 if Walgreens were required to divest up to 1,000 stores. But Walgreens had already committed to a 1,000-store divestiture under the Original Merger Agreement. In other words, the Rite Aid Board agreed to substantially reduce the payments to Rite Aid shareholders in return for effectively nothing.

58. While Rite Aid public stockholders stood to bear the full brunt of the 22% (or more) decrease in value, the Rite Aid Board secured personal benefits and compensation packages that mitigated any impact on Rite Aid insiders. For example, Standley was set to receive $8,418,630 in cash as part of his golden parachute severance package under the Original Merger Agreement. Under the Revised Merger Agreement, Standley would still receive $8,113,015 in cash. This represented a decrease of only 3% as compared to the 22% drop in consideration that Rite Aid shareholders would suffer. To be sure, Standley's equity awards would be worth

- 21 -

incrementally less after the Original Merger Consideration dropped, but Standley was materially insulated from the wholesale reduction by virtue of his anticipated $8 million cash payment.  Indeed, during the pendency of the Original Merger, Standley's target annual bonus payment actually increased from $4,600,000 to $4,738,001.  These payments placed Standley's incentives when negotiating a price reduction with Walgreens in conflict with the interests of Rite Aid's public shareholders.

59.  Despite the reduced consideration for other shareholders, the Rite Aid Board did not give up on their unique rollover benefits.  Under the Revised Merger Agreement, the Rite Aid Board would still have rolled over most of their equity options and all of their restricted stock and performance stock units into comparable shares of Walgreens equity.  Rite Aid disclosed that, as of March 3, 2017, the value of these insider benefits at least ranged from over $128,000 to over $139,000 for directors, and from over $590,000 to over $17 million for officers, with Standley receiving the largest share.

60.  The Rite Aid Board's willingness to agree to substantially reduced payments to shareholders while doling out tens of millions of dollars in change-of-control payments, continuing interests in the post-merger entities, and other incentives to themselves and other Rite Aid insiders demonstrates that the Rite Aid Board sought to have the self-interested deal approved at all costs.  By deciding to wipe out up to

- 22 -

$2.6 billion in cash consideration to be paid to Rite Aid shareholders, the Rite Aid Board revealed an unyielding fealty to their own self-interest in pushing through a deal, no matter the detriment to Rite Aid's shareholders.

61.     Then, on June 29, 2017, Defendants stunned the market once again with the announcement that they had terminated the Revised Merger Agreement and, instead, entered into the Asset Purchase Agreement under which Walgreens would simply acquire 2,186 Rite Aid stores, with Rite Aid continuing to operate as an independent company.  On June 29, 2017, Walgreens held an earnings call for its third fiscal quarter.  In his prepared remarks, Pessina stated, "I view this deal as being more attractive than the transaction it replaces."  On September 19, 2017, Rite Aid announced that it secured regulatory clearance for an amended and restated asset purchase agreement whereby Walgreens will purchase only 1,932 Rite Aid stores, three distribution centers, and related inventory for $4.375 billion in cash.

62.     As a result of the pending mergers, Rite Aid was unable to achieve the same operating success it otherwise would have been able to achieve had the Rite Aid Board not entered into the Original Merger Agreement and the Revised Merger Agreement.  Indeed, Standley later admitted during a June 29, 2017 conference call with shareholders that "the prospects of the merger sort of hanging out there . . . certainly made life a little bit more complicated" and that "there has been some impact on us from being in the merger process."  Securities analysts from Guggenheim, on

- 23 -

August 6, 2017, confirmed the negative impact on Rite Aid from the mergers: "We believe that merger disruption (1) cost RAD entry into certain preferred networks (hurting script count), (2) made it harder to drive incremental COGS reduction to protect GM, and (3) stood in the way of aggressive SG&A management. This disruption could have accounted for well over 50% of these EBITDA declines."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

63.     Throughout the Class Period, Defendants issued a series of materially false and misleading statements regarding the likelihood that the Original Merger and, later, the Revised Merger would receive regulatory approval as then-constituted, as well as the detriment that would result in the event either deal was not approved.

### *Pre-2015 Proxy False and Misleading Statements*

64.     The Class Period begins on October 27, 2015.  On that day, Rite Aid announced the Original Merger Agreement under which Walgreens would acquire the Company for $9.00 per share in an all-cash transaction valued at approximately $17.2 billion.  In a press release announcing the Original Merger Agreement, Standley stated that the Original Merger would "***deliver[] significant value to our shareholders***." The release further stated that "[t]he transaction is ***expected to close in the second half of calendar 2016***," after "the expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976," during

which time the FTC would review the potential antitrust implications of the deal, and other conditions.

65.    The next day, Rite Aid filed with the SEC on Form 8-K further commentary regarding the Original Merger (the "October 29, 2015 Form 8-K").  A "script" for meetings with Rite Aid associates attached to the October 29, 2015 Form 8-K stated that the Original Merger would "provide[] . . . *significant value* to our shareholders" and "[e]nhance[] our position and long-term growth outlook."  The script made a point to downplay any antitrust risk, stating that after "extensive consultation with anti-trust counsel, and *based upon the complementary nature of the market profiles of both companies*, and the amount of pharmacy counters in the U.S., *we do not believe the combination should cause regulatory concern*."  The script went on to state that even if there was a regulatory issue, "under the terms of the merger agreement, *Walgreens Boots Alliance can divest some stores if needed to obtain FTC approval*."  The full Rite Aid Board, including Standley, were the makers of these statements as they had the authority and ability to correct any false or misleading statements made about the Company's business, operations or prospects, and had ultimate control over the contents of the information provided to investors and the market on the Company's behalf.

66.    Defendants reiterated these representations in additional attachments to the October 29, 2015 Form 8-K, including a series of "talking points" that described

- 25 -

the $9.00 per share Original Merger Consideration as providing "immediate and significant value to our shareholders," and a set of prepared "FAQs" that expressly refuted concerns over the companies' "overlap in stores in certain markets" that may require store divestitures: "***We believe there will be a minimal level of overlap***, as Walgreens and Rite Aid have largely complementary retail pharmacy footprints in the U.S." The FAQs also provided the following retort to the notion that there would be "***any reason why this deal wouldn't happen, such as anti-trust issues***": "We can't speculate on the decisions of any regulatory agency, but both Rite Aid and Walgreens have had extensive consultation with anti-trust counsel, and ***based upon the market profiles of both companies***, and the amount of pharmacy counters in the U.S., ***we do not believe the combination should cause regulatory concern***." The full Rite Aid Board, including Standley, were the makers of these statements as they had the authority and ability to correct any false or misleading statements made about the Company's business, operations or prospects, and had ultimate control over the contents of the information provided to investors and the market on the Company's behalf.

67.     Also on October 29, 2015, Rite Aid filed the Original Merger Agreement with the SEC. The Original Merger Agreement provided for a divestiture cap of 1,000 stores, meaning that Walgreens would divest up to 1,000 stores to satisfy antitrust regulators if necessary. During a November 10, 2015 presentation at the

- 26 -

Credit Suisse Healthcare Conference, Gourlay, the Co-COO of Walgreens, stated: "*[W]e believe that it's probably about half that number*" – meaning that only about *500 stores* would need to be divested to obtain regulatory approval.  Similarly, during a November 17, 2015 Morgan Stanley Global Consumer & Retail Conference, Fairweather, Walgreens' Global CFO, stated: "*We're anticipating that store divestitures will be less than 500, although our contract provides for up to 1,000, but we don't anticipate that will be the case*."

68.      The statements referenced above in ¶¶64-67 were materially false and misleading because Defendants did not subjectively believe these statements to be true, and Defendants failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a)      Far from presenting no "regulatory concern" because of a purportedly "minimal level of overlap," the Original Merger was unlikely to garner regulatory approval because of the significant market overlap between Rite Aid and Walgreens stores;

(b)      Because of the significant market overlap between the companies, Walgreens would need to divest substantially more stores than the 1,000-store cap provided for in the Original Merger Agreement in order to obtain FTC approval, and, thus, the divestiture cap was not the conservative fail-safe Defendants represented it to be;

- 27 -

(c)     Walgreens would not be willing to bear the antitrust risks or even maintain its commitment to divest up to 1,000 stores, as represented, without a decrease in the deal price; and

(d)     The $9.00 per share Original Merger Consideration did not represent "significant value" for Rite Aid shareholders because the Original Merger Consideration, which was the product of a flawed sales process designed to benefit Rite Aid insiders at the expense of the Company's unaffiliated shareholders, did not reflect Rite Aid's growth potential, and Walgreens would demand a reduction in the deal price in order to complete the deal.

### Defendants' Materially False and Misleading 2015 Proxy in Support of the Original Merger

69.     In an attempt to secure stockholder support for a proposed deal in which they were set to reap disproportionate personal benefits, the Rite Aid Board – following review, editing, and approval by Walgreens – filed the 2015 Proxy with the SEC on December 18, 2015 and mailed the same to Rite Aid stockholders on or about December 28, 2015.  The Rite Aid Board and Walgreens included the following recommendation in the 2015 Proxy, which misleadingly downplayed the antitrust risks in the Original Merger Agreement:

### Recommendation of Our Board of Directors to Approve the Merger Agreement and the Transactions Contemplated Thereby

The Board of Directors, after considering various factors described below, determined that the merger agreement and the transactions

- 28 -

contemplated by the merger agreement, including the merger, are advisable, fair to and in the best interests of Rite Aid and its stockholders, and adopted, approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement. The Board of Directors' determination was unanimous among the directors present, with one director absent due to medical reasons.

The Board of Directors recommends that you vote "FOR" the proposal to approve the merger agreement and the transactions contemplated by the merger agreement, including the merger.

### *Reasons for the Merger*

In evaluating the merger agreement and the transactions contemplated thereby, the Board of Directors consulted with Rite Aid's management and legal and financial advisors and, in reaching its determinations, the Board of Directors considered a variety of factors with respect to the merger and the other transactions contemplated by the merger agreement, including the factors listed below (not necessarily in order of relative importance).

*       *       *

- ***The <u>fact</u> that the $9.00 all-cash per share merger consideration will provide certainty of value and liquidity to Rite Aid stockholders, enabling them to realize value that had been created at Rite Aid in recent years, while eliminating long-term business and execution risk****.*

*       *       *

- ***The Board of Directors' belief that the merger and related transactions with WBA would be completed successfully, based on, among other things****,* the Board of Directors' taking into account its knowledge of WBA's financial condition and ability to fund the aggregate per share merger consideration, the repayment of all amounts owed under Rite Aid's existing credit agreements, all amounts payable in connection with any change of control offers required to be made and all other payments required in connection with the transaction, including associated fees and

- 29 -

expenses, and ***the level of commitment by WBA to obtaining applicable consents and approvals under antitrust and similar laws and assuming the risks related to certain conditions and requirements that may be imposed by regulators in connection with securing such approvals up to a specified threshold, including the commitment to sell up to 1,000 stores of Rite Aid or WBA and take certain other limited actions, in each case, in order to avoid or vacate any order that would prevent or materially delay the merger***.

70.     These statements were materially false and misleading because Defendants did not subjectively believe these statements to be true, and Defendants failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a)     Walgreens would not be willing to bear the antitrust risks or even maintain its commitment to divest up to 1,000 stores, as represented, without a decrease in the deal price; and

(b)     The $9.00 per share Original Merger Consideration did not represent "significant value" for Rite Aid shareholders because the Original Merger Consideration, which was the product of a flawed sales process designed to benefit Rite Aid insiders at the expense of the Company's unaffiliated shareholders, did not reflect Rite Aid's growth potential, and Walgreens would demand a reduction in the deal price in order to complete the deal.

71.     The Rite Aid Board compounded these misleading statements with generic and boilerplate "potentially negative factors," which: (a) did not sufficiently

- 30 -

describe the severe risk of a failed deal; (b) did not sufficiently counteract the Rite Aid Board's representation of "fact" that the then-proposed Original Merger "will provide certainty of value and liquidity to Rite Aid stockholders"; and (c) misleadingly downplayed the fact that Walgreens could and would force a revised deal even if it were required to divest fewer than 1,000 stores. Defendants generically represented the relevant "potentially negative factors" as follows:

> The Board of Directors weighed the foregoing against a number of potentially negative factors, including:
>
> \*        \*        \*
>
> - The fact that the completion of the merger would require expiration or termination of the applicable waiting periods under the HSR Act and the amount of time that might be required to obtain such expiration or termination, and the risk that other regulatory agencies may not approve the merger.
>
> \*        \*        \*
>
> - The risk that the merger could be delayed or not completed.
>
> \*        \*        \*
>
> - ***The fact that WBA is not required to accept divestiture and other remedies imposed by governmental authorities (i) that would result in the divestiture of more than 1,000 WBA and Rite Aid stores*** or (ii) other than (a) certain specified remedies or (b) remedies that would not result in an impact exceeding $100 million in the aggregate as a result of such remedies.

72.     The Rite Aid Board's statement that Walgreens "is not required to accept divestiture and other remedies imposed by governmental authorities . . . that

- 31 -

would result in the divestiture of more than 1,000 WBA and Rite Aid stores" was itself materially false and misleading because Walgreens and the Rite Aid Board were prepared to renegotiate a deal at divestiture levels below the supposedly "committed" 1,000 stores, thus, they could not have subjectively believed this statement to be true.

73.     Moreover, the "Background of the Merger" section in the 2015 Proxy stated that "During the week of May 17, 2015, Mr. Standley and Mr. Pessina continued their discussions about possible terms of a transaction and, as directed by the Board of Directors in the May 14, 2015 meeting, Mr. Standley expressed Rite Aid's request that, among other things, WBA increase its proposed per share price to a $11.00 to $12.00 per share range, and view that *any definitive agreement would need to provide for a high degree of certainty in terms of WBA's obligation to obtain antitrust approvals.*" This stated "need" to provide regulatory certainty – when considered alongside the 2015 Proxy's representation that Walgreens (not Rite Aid stockholders) agreed to assume the risks "related to certain conditions and requirements that may be imposed by regulators" – was materially false and misleading given that the Rite Aid Board was prepared to renegotiate a deal at divestiture levels below the supposedly "committed" 1,000 stores, thus they could not have subjectively believed this statement to be true.

74.     In sum, the 2015 Proxy represented to Rite Aid shareholders that the Original Merger presented little to no risk of not clearing antitrust regulatory review

- 32 -

and that, to the extent any related regulatory risk did exist, it would be borne solely by Walgreens.

75.     The 2015 Proxy failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them: (a) the Original Merger had a high likelihood of failing to pass antitrust scrutiny; (b) the 1,000-store divestiture cap was insufficient to garner regulatory approval; and (c) the risk of failing to gain antitrust approval would be largely borne by Rite Aid stockholders, not Walgreens as represented, because, in the event of non-approval, the Rite Aid Board would slash the Original Merger Consideration to be paid to Rite Aid shareholders without any commensurate benefit instead of seeking available termination fees from Walgreens. Rather than specifying these risks as required, the 2015 Proxy simply provided a boilerplate statement that there were "risks related to obtaining the requisite consents to the merger," which itself was misleading in light of Defendants' statements elsewhere that affirmatively portrayed these generic risks as insignificant.

76.     The entire Rite Aid Board was responsible for the misleading statements in the 2015 Proxy. Standley signed the cover letter issuing the 2015 Proxy and did so explicitly "On behalf of our [Rite Aid] Board of Directors." Further, the Rite Aid Board explicitly adopted and issued the full 2015 Proxy when stating as follows in the cover letter:

- 33 -

*Rite Aid's Board of Directors*, after considering the reasons more fully described in this proxy statement, determined that the merger agreement and the transactions contemplated by the merger agreement, including the merger, are advisable, fair to and in the best interests of Rite Aid and its stockholders, and adopted, approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement. *The Board of Directors recommends that you vote (i) "FOR" the proposal to approve the merger agreement and the transactions contemplated by the merger agreement, including the merger*, (ii) "FOR" the proposal to approve, by a non-binding, advisory vote, compensation that will or may become payable by Rite Aid to its named executive officers in connection with the merger and (iii) "FOR" the proposal to approve one or more adjournments of the special meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

The enclosed proxy statement provides detailed information about the special meeting, the merger agreement and the merger. . . .

\*     \*     \*

*On behalf of our Board of Directors*, I thank you for your support and appreciate your consideration of this matter.

Sincerely,

John T. Standley
*Chief Executive Officer and Chairman of the Board of Directors*

77.    The "Notice of Special Meeting of Stockholders," which the Rite Aid

Board attached to the cover of the 2015 Proxy, also stated that it was issued "By Order

of the Board of Directors" and repeated the language above, stating that: "The Board

of Directors recommends that you vote (i) 'FOR' the proposal to approve the merger

- 34 -

agreement and the transactions contemplated by the merger agreement, including the merger." The Rite Aid Board repeated similar language throughout the 2015 Proxy. Thus, the materially false and misleading statements in the 2015 Proxy were made on behalf of the full Rite Aid Board who had the ultimate authority over each statement, including their content and whether and how to communicate them.

78.     Walgreens is also responsible for the false and misleading statements and omissions in the 2015 Proxy. The Original Merger Agreement obligated Rite Aid to file the 2015 Proxy and stated:

> Prior to filing or mailing the Proxy Statement (or any amendment or supplement thereto, other than in connection with a Change of Recommendation made in compliance with this Agreement), or responding to any comments of the SEC or its staff with respect thereto, the Company shall provide [Walgreens] a reasonable opportunity to review and to propose comments on such document or response and consider in good faith such comments proposed by Parent for inclusion therein.

Thus, Walgreens also had ultimate authority over each statement, including their content and whether and how to communicate them. Despite having knowledge of adverse facts, Walgreens failed to correct the false and misleading statements in the 2015 Proxy.

## *Defendants' False and Misleading Class Period Statements After the 2015 Proxy*

79.     On December 10, 2015, Rite Aid and Walgreens each received a second request from the FTC in connection with the Original Merger.

80.     On December 11, 2015, Rite Aid and Walgreens issued a joint press release stating that "as expected, the two companies have each received a request for additional information" from the FTC.  The release characterized the request as a "*standard part of the regulatory process in connection with the FTC's review*."  The release also stated that "Walgreens . . . and Rite Aid have been cooperating with the FTC staff since shortly after the announcement of the proposed acquisition," and that "[b]oth companies expect the transaction to close in the second half of calendar 2016."

81.     On January 7, 2016, Walgreens held an earnings call for its first fiscal quarter of 2016.  On the call, Pessina assured investors, "*I would reiterate that this transaction is progressing as we expected and planned*."  He also reiterated that the FTC's second request for additional information, was simply "*a standard part of the regulatory process in connection with the FTC's review.*"  To drive the point home, he stated that a "highly experienced integration team" had already "been up and running since the end of November" and was "now *well underway on preliminary planning work*" related to combining the two companies.  When an analyst asked Pessina if he still thought that the number of store divestitures needed to obtain FTC approval would be less than 500, he responded: "*We don't have any reason to change our view*.  As I have said before, we're working with the relevant [targets] in order to speed up the process if possible of course.  For the time being, we cannot add any

- 36 -

comment to what we have said.  *We are still confident that this will go through in the terms that we have anticipated*."

82.     On January 27, 2016, at Walgreens' annual shareholders meeting, Pessina stated in his prepared remarks that the regulatory review of the Original Merger was "*proceeding as we had anticipated* and we continue to expect the transaction to complete at some point in the *second half of this calendar year*."

83.     From January to April 2016, Rite Aid and Walgreens provided documents and data in response to the FTC's second request.  During this time, counsel for both companies purportedly had "extensive discussions" with the FTC staff.  Counsel provided updates of those discussions to Defendants.

84.     On April 5, 2016, Walgreens held an earnings call for its second fiscal quarter of 2016.  In his prepared remarks, Pessina stated: "Of course, *our agreement to acquire Rite Aid is continuing as we expect, with the regulatory approval process progressing in line with the timetable we had expected*."  During the Q&A session, an analyst asked about store divestitures related to the Original Merger, saying the issue was "obviously [at the] top of mind for investors."  Pessina stated that "*[n]othing has changed*" from earlier pronouncements and that "[t]he process is developing and an absolute normal way . . . . *But it's nothing atypical, exactly online with what we were expecting*."

1311192_1

85.     From late April to August 2016, the FTC staff identified geographic areas of concern with respect to Walgreens' and Rite Aid's overlapping operations. The 2017 Proxy suggests that the FTC informed Defendants that the Original Merger would likely have anticompetitive effects under §7 of the Clayton Act, and states that, as a remedy, Walgreens "proposed the divestiture of certain Rite Aid stores as a cure to maintain or restore competition in certain areas."

86.     On July 6, 2016, Walgreens held an earnings call for its third fiscal quarter of 2016.   Once again, in his prepared remarks Pessina stated that the "**_proposed acquisition of Rite-Aid is progressing as planned_**" and that the "**_integration team is continuing its work on preliminary planning_**."   Later on the call, in response to an analyst question regarding the expected number of store divestitures, Pessina responded:

> **_We still believe that our initial estimate is correct_**.  We still believe that, at the end, we will stay in the range of the stores that we initially indicated, around 500.  **_And time-wise, we still believe that we will be able to really do the deal, finish the deal, by the end of this calendar year, as we said.  So, by December, we believe that everything will be done_**.

87.     On September 8, 2016, Walgreens issued a press release providing an update on the Original Merger.   The release stated that Walgreens was actively engaged with the FTC and that as a result of "progress of these discussions with the FTC staff" it was "exploring potential divestiture remedies."   The release continued

that "*[i]n order to expedite that process*, . . . the most likely outcome will be that the parties will be required to divest more than the 500 stores previously communicated, *but still continues to expect that fewer than 1,000 stores will be required to be divested*." The release further stated, "the company continues to believe that the acquisition *will close in the second half of calendar 2016*." Thus, Defendants led investors and the market to believe that the Original Merger was close to closing within the parameters set forth in the Original Merger Agreement.

88.     But just over one month later, on October 20, 2016, Rite Aid and Walgreens issued a joint press release announcing they had extended the merger agreement end date under the Original Merger Agreement from October 27, 2016 to January 27, 2017. That same day, Walgreens held an earnings call for its fourth fiscal quarter and full fiscal year of 2016. In his prepared remarks, Fairweather referred to the recent developments impacting the Original Merger, stating, "we remain actively engaged with the FTC on its review" and that "*the most likely outcome will be that the parties will be required to divest between 500 and 1,000 stores*." Fairweather stated that Walgreens "will be able to execute agreements to divest these stores to potential buyers pending FTC approval, by the end of calendar year 2016" – *i.e.* within the original timeframe – although the deal was now expected to close in early calendar 2017. Pessina also participated on the call and, as Walgreens' highest ranking officer, had the authority and ability to correct any false or misleading

- 39 -

statements made about the company's business, operations or prospects, and ultimate control over the contents of the information provided to investors and the market on the company's behalf, but he failed to correct Fairweather's materially false and misleading statements.

89.    Walgreens also included Rite Aid accretion from the Original Merger in its fiscal 2017 guidance, leading an analyst on the call to ask Pessina: "So, what gives you confidence in an early 2017 close?"  Pessina responded by stressing that he was "***as confident as we were before***" that the deal would close under the terms of the Original Merger Agreement based on Walgreens' discussions with the FTC and Walgreens' own internal analyses:

> Rite Aid, yes, I agree with you that it is taking more than we expected. ***But, I have to tell you that as you have seen from our presentation and from the fact that we have included some part of Rite Aid potential profit now in our guidance, from this you can really understand that we are confident, as confident as we were before about this deal. Nothing has changed***, we just have a delay in the execution of the deal. This is our perception, we have always been optimistic because ***we have never seen an attitude from the FTC, which was an absolute negative***, of course they were inquiring.  They were detailed.  They were asking a lot of questions.  Sometimes they were taking time to respond, but at the end of the day, I believe we have a good collaboration – we're having a good collaboration.  We try to respond to all of their needs.  This takes time.  ***But at the end, we are still confident***.
>
> Of course, ***I know that we read on the papers are different news, no idea about the sources of this news, but for sure if we could talk, and of course you know that we cannot (laughter) our news would be different***.  For what we see today, we see just a long administrative process, but ***we don't see substantial differences from what we were***

- 40 -

*expecting.  Yes, probably more stores, a little more stores here and there, but at the end of the day – as far as I can see today, as far as we can see today, we are absolutely confident that we can create, that we can do the deal and we can create the value.  Just this value will be a little postponed on time*.

Because, even when we would do the deal, of course for the first month, we will not be able to extract immediately the synergies.  It will take some time.  We were hoping to do the deal at the beginning of this fiscal year for us.  In this case, we would have had time to level up some of the synergies.  Of course, if we close the deal relatively late in our fiscal year, the synergies will be smaller.  ***But we will find all of them next year***.

90.     On November 8, 2016, Walgreens presented at the Credit Suisse Healthcare Conference.  In his prepared remarks, Pessina rejected any notion that the Original Merger had encountered regulatory turbulence based on his insider knowledge purportedly obtained during the review process:

And if we can add something, everybody we have seen today and in the last days is asking about Rite Aid and about – *we have a different opinion than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of*.

*So, just to reassure you, if we say that we are confident, it is because what we know makes us very confident*.  I don't believe that there is any technical reason why this deal should not go through.  Of course, everything is possible politically.

But, until now, *we have seen a careful, diligent, but absolutely not hostile attitude of the FTC.  And we are collaborating.  We are presenting our barriers.  And I believe that so far, so good.  And we continue to be very positive in spite of the opinion of certain people who apparently are not particularly well informed*.

- 41 -

91.     Later in the call, Pessina stated that Walgreens now has to "focus on Rite Aid" and the integration process.  He also stated, in response to a question about Walgreens' guidance for Rite Aid, that "[t]he synergies will come in quite in line with what we have announced to the market in the following two years, particularly our fiscal 2018 and 2019."  Gourlay added: "all of that will become available as we move through the next two to five years for the drug stores of Rite Aid that we expect to be able to purchase in the back end of this year or early next year."

92.     On November 15, 2016, Walgreens participated in the Morgan Stanley Consumer Conference where Gourlay was asked if he had any further updates regarding Rite Aid.  Once again, Gourlay rebutted any notion that the Original Merger had generated any regulatory concern and reiterated that his confidence was as strong as it was on "day one" when the transaction was announced:

> No, the process continues, the process has never stopped.  It's a process that clearly has taken longer than we had anticipated.  We happened to sell potentially to a few more pharmacies than we anticipated.  We have buyers.  When I say we have buyers, not a buyer, we have buyers.  *We believe these buyers – we believe strongly these buyers meet the criteria the SEC have laid down*.  And the process continues and we've given an update saying that we expect to give more information on the deal in the early part of next year and we stick by that.  So we don't recognize what's written in the press, to be honest.  We don't recognize the names or the people talking about it.  So we don't know what that's being said.  *We remain, as we did from day one, confident about [doing] strategic deal for us*.  The Rite Aid board clearly believes it's a good deal for them and we believe we will get it done.

93.     Gourlay went even further in response to a question about how Rite Aid fit into Walgreens' strategy, stating, "*we believe even more in the Rite Aid deal from that point of view than we believe probably two years ago* we've understood the market and these network change have happened."  Pessina, as Walgreens' highest ranking officer, had the authority and ability to correct any false or misleading statements made about the company's business, operations or prospects, and ultimate control over the contents of the information provided to investors and the market on the company's behalf, but he failed to issue corrections to Gourlay's materially false and misleading statements.

94.     On November 17, 2016, Walgreens presented at the Jefferies Healthcare Conference.  During the conference, Fairweather, Walgreens' Global CFO, reiterated that "nothing really has changed" regarding the Original Merger and that he was "*very clear*" that the deal would pass regulatory review within the divestiture cap:

> *We are very clear – from what we said in September, we expect the deal to complete*.  We have been absolutely consistent on that from day one when we announced it.  *As we said back in September and reinforced in our results, we do expect the store divestitures to now be in the range of 500 to 1000*.
>
> We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction in the first quarter, so it is – sorry, early in the new year, in the calendar year.
>
> So other than really from where we are a year ago, it is a few more divestitures than we had originally anticipated but within what we had in the contract, and it has just taken us a little bit longer than – ideally we

- 43 -

would have hoped to work through with the FTC when we work in a very collaborative manner (inaudible).

But, fundamentally, the economics of the deal are the same.  We still expect to be able to deliver the $1 billion of tangible, measurable cost synergies in a 3- to 4-year period.  The benefits are from the front end; all these other things, ***nothing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place. There's lots of stuff in the papers but it is amazing where it comes from.***

95.     Gerald Gradwell ("Gradwell"), Walgreens' Senior Vice President, bolstered Fairweather's remarks by stating that they had "clarity" on the issue derived from the companies' extensive due diligence, merger-related expertise and discussions with FTC personnel:

But I think – ***just to be clear on where we are in the process and we have spoken about this – I mean we have enough clarity on what we have to do in terms of remedies with the FTC to be – to have opened the data room for sale of pharmacies to potential buyers***.

Everyone I know – there was large speculation in the marketplace that we would never find buyers.  We are not entirely that green when it comes to doing transactions.  We went into this in the knowledge that the Walgreens management team had looked at Rite Aid in many different ways and had not been able to justify the deal for a variety of reasons.

And so we went into it having assessed initially that we would be able to find buyers and that those interested in the marketplace to buy stores we may have to divest.  ***That remains the case.  We have been in ongoing discussion with the FTC***.

Pessina, as Walgreens' highest ranking officer, had the authority and ability to correct any false or misleading statements made about the company's business, operations or prospects, and ultimate control over the contents of the information provided to

- 44 -

investors and the market on the company's behalf, but he failed to issue corrections to Gradwell's materially false and misleading statements.

96.     On December 20, 2016, Rite Aid and Walgreens issued a joint press release announcing that they had entered into an agreement with Fred's Inc. ("Fred's") to sell 865 Rite Aid stores for $950 million in an all-cash transaction in order to complete the Original Merger.  The release stated that the "agreement is being entered into to respond to concerns identified by the FTC in its review of the proposed acquisition of Rite Aid by Walgreens . . . , which was announced in October 2015." The release further stated that Walgreens was "actively engaged in discussions with the FTC regarding the transaction and is working toward a close of the Rite Aid acquisition in early calendar 2017," which, if accomplished, would have completed the deal within the extended timeframe and divestiture cap under the Original Merger Agreement.  The release quoted Pessina as stating: "***With this agreement, we are moving ahead with important work necessary to obtain approval of our acquisition of Rite Aid***."   The market understood Pessina's comments to indicate that the extended timeframe and announced divestitures meant the Original Merger was close to receiving the necessary regulatory approvals.

97.     On January 5, 2017, Walgreens held an earnings call for its first fiscal quarter of 2017.  Fairweather began his prepared remarks by stating: "We continue to make good progress towards completing our Rite Aid transaction, and today we have

raised the lower end of our adjusted earnings per share guidance for FY17." He later added: "So turning now to our pending acquisition of Rite Aid. As you'll see from today's earnings press release, we are actively engaged in discussions with the FTC, and are ***still working towards a close of the acquisition in the early part of this calendar year***, having announced the Fred's agreement on December 20, 2016." He also reaffirmed 2017 fiscal guidance that included Rite Aid accretion of $0.05 to $0.12 adjusted diluted net earnings per share for the year.

98.      Pessina followed up in his prepared remarks by highlighting "the progress we have announced at the end of December, regarding the proposed transaction with Rite Aid, in having reached a conditional agreement with Fred's." He continued that the FTC review process, while slow, allowed him to "remain as convinced as ever of the strategic benefits of the proposed Rite Aid transaction." He then added: "We are clearly making progress, and while I would always like to move faster and do more, we must be measured and ensure we work at a pace with which ***we are confident we can deliver for our customers and our shareholders, on all the plans and strategies we have discussed with you***." When asked if Walgreens had a "Plan B" in the event the Original Merger was not approved, Pessina said the company did not, and that:

> [W]e don't want even to think of the fact that this could not be approved after so many months, when we have given a lot of information, and ***we***

*have had a very good relationship with the people of the FTC. . . .  So
we are not thinking of a Plan B today*.

99.      Shortly after these statements, on January 30, 2017, Rite Aid and
Walgreens announced that they had terminated the Original Merger Agreements and
entered into the Revised Merger Agreement, slashing the Original Merger
Consideration to be paid to Rite Aid shareholders from $9.00 per share to between
$7.00 and $6.50 per share, depending on the number of Rite Aid stores that Walgreens
would need to divest to satisfy antitrust regulators (wiping out up to $2.6 billion that
was to be paid to Rite Aid shareholders), and that they extended the merger deadline,
yet again, to July 31, 2017.

100.     On April 5, 2017, Walgreens held an earnings call for its second fiscal
quarter of 2017.  In his prepared remarks, Pessina touted Walgreens' announcement of
a $1 billion share repurchase program that became available as a result of the Revised
Merger, which would return value to Walgreens shareholders  "without undermining
our intention to [profitably] deleverage the company *following the closing of the
proposed Rite Aid acquisition*."  Pessina added: "I am still optimistic that we will
bring this deal to a successful conclusion" and that "*[w]e believe that we can [certify
compliance] in the coming weeks*[.]"  He concluded by reassuring investors that the
Revised Merger Agreement would be more likely to satisfy regulators:

*The changes to the deal that we agreed in January demonstrate our
absolute commitment to ensure all transactions meet our demanding*

- 47 -

> ***financial and strategic requirements while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval.***

When asked by an analyst, "[W]here exactly aren't you and the FTC seeing eye to eye?," Pessina responded with: "***I am still positive on this deal. I believe that we have a strong argument for -- to defend this deal***" and added that "***We are collaborating very well with the FTC. And as I said, we are preparing our facts to be ready to certify compliance, if we will decide to do so.***"

101.    The statements referenced above in ¶¶80-100 were materially false and misleading because Defendants did not subjectively believe them to be true, and Defendants failed to disclose the following adverse facts that were known to Defendants or recklessly disregarded by them:

(a)    From late April to August 2016, the FTC staff identified geographic areas of concern with respect to Walgreens and Rite Aid's overlapping operations.  The 2017 Proxy suggests that during this time, the FTC told Defendants that the Original Merger would likely have anticompetitive effects under §7 of the Clayton Act;

(b)    Far from presenting no "regulatory concern," the FTC had informed Defendants that the Original Merger was unlikely to garner regulatory approval as then-constituted because of the significant market overlap between Rite Aid and Walgreens stores.  In fact, as a result of prior discussions with the FTC, Rite

- 48 -

Aid's legal advisors had already concluded by January 6, 2017 that "*the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date*" in light of the "*increasing likelihood that the merger would not be consummated by the January 27, 2017 end date*." And by that point (January 6, 2017), the FTC had already subpoenaed members of Fred's management and sent document requests regarding the potential divestiture. Yet, one day prior (January 5, 2017), with access to the same underlying facts and information, Walgreens executives stated the opposite: that they are *still "working towards a close of the acquisition in the early part of this calendar year"*;

(c)     Defendants did not possess "clarity" from their non-public discussions with FTC regulators that the deal would be approved, but, rather, FTC officials had expressed concern that the planned divestitures did not go far enough to preserve competition in the pharmaceutical marketplace;

(d)     Defendants' inclusion of Rite Aid accretion in Walgreens' fiscal 2017 had no reasonable basis as the Original Merger would not be approved as then-constituted and, thus, the accretion would not occur;

(e)     The delay in the regulatory review process and FTC requests for additional information were not simply routine and inconsequential as Defendants had represented, but, instead, indicated to Defendants that the FTC had significant concerns about the deal and was unlikely to approve it;

- 49 -

(f)     Walgreens would need to divest substantially more stores than the 1,000-store cap provided for in the Original Merger Agreement in order to obtain FTC approval, and thus this cap was not the conservative fail-safe represented by Defendants; and

(g)     Walgreens would refuse to bear the risks related to a failure to secure antitrust regulatory approval for the Original Merger, as represented, without a drastic reduction in the deal price.

## RITE AID'S ARTIFICIALLY INFLATED STOCK PRICE TUMBLES AS THE TRUTH IS REVEALED TO THE MARKET

102.    On January 20, 2017 – *barely two weeks* after Defendants had stressed their "confidence," based on purported insider knowledge and conversations with regulators, that the deal would be approved by the FTC as structured – *Bloomberg* reported in an article entitled, "Walgreens Faces U.S. Antitrust Concerns Over Rite Aid Fix," that the FTC was, in fact, unlikely to approve the deal.  The article relayed the concerns of FTC officials that "Walgreens's proposal to sell 865 drugstores . . . doesn't go far enough to preserve competition that would be lost in the tie-up."  The article noted that the revelation ran sharply counter to investor expectations.  On this news, the price of Rite Aid stock fell $1.70 per share, or 20%, over two trading days to close at $6.90 per share on unusually high volume.

- 50 -

103.     Ten days later, on January 30, 2017, Rite Aid and Walgreens announced that the Rite Aid Board had agreed to slash the Original Merger Consideration to be paid to Rite Aid shareholders from $9.00 per share to between $7.00 and $6.50 per share, depending on the number of Rite Aid stores that Walgreens would need to divest to satisfy antitrust regulators (wiping out up to $2.6 billion that was to be paid to Rite Aid shareholders), and that they extended the merger deadline, yet again, to July 31, 2017.   On this news, the price of Rite Aid stock again plummeted by $1.21 per share, or 17%, to close at $5.72 per share on January 30, 2017.  The decline continued over subsequent days, and by market close on February 2, 2017, the price of Rite Aid stock had declined to $5.25 per share – little more than half of the original purchase price offered by Walgreens, and the lowest price for Rite Aid stock since 2014.

104.     Then, on June 29, 2017, Defendants once again stunned the market when they announced that they had terminated the Revised Merger Agreement and, instead, entered into the Asset Purchase Agreement.  On this news, Rite Aid's stock price dropped by over 26% to close at $2.89 per share on June 29, 2017.

## DEFENDANTS CONCEDE THAT RITE AID'S STOCK PRICE WAS ARTIFICIALLY INFLATED DURING THE CLASS PERIOD

105.     As a result of Defendants' materially false and misleading statements alleged herein, Rite Aid stock traded at artificially inflated prices during the Class

1311192_1

Period.  On October 26, 2015, the last trading day prior to Defendants' announcement of the Original Merger Agreement, Rite Aid's stock closed at $6.08 per share. Defendants' false and misleading statements downplaying the antitrust risks inherent in the Original Merger sent Rite Aid's stock price well above $6.08 per share over the following year, typically trading above $7.50 per share.  After the truth underlying Defendants' false and misleading statements was revealed to the market, the price of Rite Aid stock plummeted by over 54% from its Class Period high.

106.    Defendants, in fact, explicitly conceded that, as a consequence of the market's misperception that the Original Merger would close on its stated terms under the Original Merger Agreement, Rite Aid stock traded at artificially inflated levels, at a minimum, between October 27, 2015 and January 30, 2017.   Indeed, after announcing the Revised Merger Agreement with the Reduced Merger Consideration of $6.50 to $7.00 per share, the low-end of which represented a 6.2% discount to Rite Aid's $6.93 per share stock price on January 27, 2017, Defendants attempted to defend that "negative premium" and address widespread public criticism of the new deal in the 2017 Proxy,  which pointed back to Rite Aid's $6.08 per share stock price on October 26, 2016 (the trading day before the Original Merger was announced) as the appropriate base price for the calculation of any premium:

> **Rite Aid believes that the January 27, 2017 stock price is not an accurate reflection of the value of Rite Aid because such stock price reflected market expectations of the likelihood that the merger would**

*occur on the terms of the original merger agreement and did not reflect the value of Rite Aid as an independent company*.

107.    Defendants included similar statements throughout the 2017 Proxy, including:

> Rite Aid believes that the premium or discount of the per share merger consideration relative to the January 27, 2017 stock price is not an accurate reflection of the value of the transaction because such stock price reflected market expectations of the likelihood that the merger would occur on the terms of the original merger agreement and did not reflect the value of Rite Aid as an independent company.
>
> *            *            *
>
> The closing price of Rite Aid's common stock on the NYSE on October 26, 2015, the last trading day prior to the date on which public announcement of the original merger agreement was made, was $6.08 per share. The closing price of Rite Aid's common stock on the NYSE on January 27, 2017, the last trading day prior to the date on which public announcement of the merger agreement amendment was made, was $6.93 per share. Rite Aid believes that the January 27, 2017 stock price is not an accurate reflection of the value of Rite Aid because such stock price reflected market expectations of the likelihood that the merger would occur on the terms of the original merger agreement and did not reflect the value of Rite Aid as an independent company.

108.    Through these statements, Defendants conceded that, during the pendency of the Original Merger, Rite Aid's stock traded at artificially inflated levels based on the market's expectation that the Original Merger would close on schedule and under the terms of the Original Merger Agreement.  The market's misperception was fueled by Defendants' repeated materially false and misleading statements that the Original Merger bore little antitrust risk and would close on schedule.  As further

- 53 -

described herein, these inflated trading levels existed far above the price at which Rite Aid stock would have traded if the market knew the truth that the deal was in serious antitrust jeopardy.

### POST-CLASS PERIOD STATEMENTS FURTHER DEMONSTRATE THAT DEFENDANTS' CLASS PERIOD STATEMENTS WERE FALSE AND MISLEADING

109.   On June 29, 2017, Walgreens held an earnings call for its third fiscal quarter of 2017.   When asked about the regulatory review process for the Asset Purchase Agreement under which Walgreens would acquire 2,186 Rite Aid stores, Defendants' response was noticeably different.   For example, after pointing out that "the stores you're trying to buy do still seem to have a decent amount of overlap with existing Walgreens stores, at least on a state-by-state basis," a securities analyst from BofA Merrill Lynch asked: "Should we assume that the new plan takes into account feedback from the FTC such that you're highly confident in a shorter FTC review for the new asset purchase? Or could this still be a battle with the FTC even for the new plan?"   Unlike in previous calls where Defendants were eager to share their "clarity" based on insider knowledge, Gradwell diverted the question to Walgreens' General Counsel, Marco Patrick Anthony Pagni ("Pagni"): "We actually have (inaudible) our Counsel, internal General Counsel here, who might answer that. Marco?"   Pagni provided the answer Defendants should have offered throughout the Class Period: "I wouldn't care to express any level of confidence one way or another as to how the

- 54 -

transaction will proceed." Another analyst later asked,

> I understand what you're saying in terms that this is more of a simple asset deal. But if I must – you're giving them an option to buy generic drugs through WBAD, and it looks like from the Rite Aid slides for a period of 10 years. Can you talk about how the FTC might view that kind of more strategic alliance on the purchasing side? And do you think that perhaps presents a different kind of hindrance?"

This time, it was Pessina who diverted the question to Pagni: "Marco?" Pagni, again, refused to comment on the FTC's views:

> We're not able to comment on how the FTC may or may not see any particular facet of this transaction. But I would say is that it's important that the Rite Aid, going forward, be competitive in the market. And clearly, it's an option to join our procurement vehicle, WBAD, will help it with its cost of goods going forward, which we believe is important for its competitive position in the market. And I express no view as to how the FTC will see that, but one could imagine that, that might be important for them.

## NO SAFE HARBOR PROTECTION

110.     Defendants' false and misleading statements during the Class Period are not immunized by the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act.  First, most of Defendants' materially false and misleading statements were not "forward-looking statements," but rather, were statements of existing fact and/or or conditions, which do not qualify for the safe harbor protection.  Second, at the time each false and misleading statement was made, the speaker had actual knowledge that the statement was false or misleading and/or the statement was authorized or approved by an executive officer and/or director who

had actual knowledge that the statement was false or misleading. Third, Defendants' cautionary statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the statement would not be misleading. Fourth, Defendants provided no meaningful cautionary language regarding their false and misleading statements, only vague and boilerplate disclaimers about general regulatory risk that failed to apprise shareholders of the true risks inherent in the mergers, which were contradicted by Defendants' false and misleading statements. Moreover, many of Defendants' boilerplate disclaimers themselves were misleading because they warned of risks that had already materialized.

## ADDITIONAL SCIENTER ALLEGATIONS

111.    As alleged herein, Defendants acted with scienter in making false and misleading statements during the Class Period in that Defendants had a motive and opportunity to commit fraud, and Defendants also had actual knowledge that their Class Period statements were false and misleading and/or were reckless in making statements that were likely to mislead investors.

112.    The Rite Aid Defendants were motivated to push through the unfair mergers in order to secure lucrative benefits and compensation packages for the Rite Aid Board and other Rite Aid insiders. Together with the Walgreens Defendants, they worked to foist the unfair deal on Rite Aid shareholders. The Walgreens Defendants misled investors to gain shareholder approval of the deal and continued to mislead

1311192_1

investors in order to rebut criticism of the deal's viability, which threatened to tarnish Pessina's strong deal-making reputation. The Rite Aid Defendants then agreed to an even worse deal for shareholders, with significantly reduced cash consideration, so that Rite Aid insiders could still reap their disproportional benefits.

113.    Defendants knew that their public statements were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

114.    As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Rite Aid, their control over, and/or receipt or modification of Rite Aid's allegedly materially misleading misstatements, and/or their associations with Rite Aid, which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

115.    In addition to their orchestration of the fraudulent scheme, Defendants' scienter is evidenced by the following: (i) the Individual Defendants' senior positions within Rite Aid and Walgreens and their extensive personal participation in the merger review process; (ii) the Individual Defendants held themselves out as the persons most knowledgeable on the topics about which they spoke, including the

- 57 -

statements alleged herein to be false and misleading; (iii) Defendants agreed to reduce the Original Merger Consideration by up to $2.6 billion with no commensurate benefits to Rite Aid shareholders; and (iv) the close temporal proximity between statements made by Defendants and the revelation that those statements were false and misleading.

## *The Individual Defendants' Access to, and Extensive Personal Involvement in, the Mergers*

116.    As the most senior executives and/or board members at their respective companies, each of the Individual Defendants participated in extensive due diligence regarding the deal and stayed regularly apprised of its progress, including developments in connection with the FTC's review.  As detailed in the 2017 Proxy, the Rite Aid Board received "regular updates" regarding the ongoing FTC review, met regularly to discuss Rite Aid's business and the merger approval process, and, beginning at least by April 2016, were specifically informed that Rite Aid needed to "establish a divestiture process" in order to "satisfy the FTC Staff's questions about the transaction[.]"

117.    The Rite Aid Board received updates regarding the FTC approval process on January 26, 2016; February 17, 2016; March 2, 2016; April 12, 2016; June 22, 2016; September 30, 2016; October 14, 2016; October 18, 2016; November 4,

2016; November 16, 2016; December 6, 2016; December 16, 2016; January 6, 2017;

and January 24, 2017.  Standley personally provided many of these updates.

118.     Similarly, the Walgreens Defendants were required to, and, in fact, did,

"make all strategic decisions and lead all discussions, negotiations and other

proceedings, and coordinate all activities with respect to any requests that may be

made by, or any actions, consents, undertakings, approvals, or waivers that may be

sought by or from, the FTC or other governmental entities."

119.     Throughout 2016, Defendants' counsel had "extensive discussions"

with the FTC, the substance of which counsel then relayed to Defendants.

120.     Moreover, and as acknowledged in the 2017 Proxy, Defendants were

specifically informed by the FTC that the Original Merger would "require a remedy."

As a result of these activities and the Individual Defendants' positions and personal

involvement in the regulatory review process, each Defendant was fully informed of

the developments in the FTC approval process, including the FTC's expressed

concerns regarding the deal and the FTC's determination that it was unlikely to

approve the Original Merger or the Revised Merger as then-constituted.

### *Defendants Repeatedly Stated that They Were Informed About the Regulatory Review Process*

121.     Defendants repeatedly held themselves out to the market as

knowledgeable on the topics on which they spoke that are alleged herein to be false

and misleading, including on conference calls with investors and security analysts. Throughout the Class Period, Defendants stated that they had knowledge and information regarding the mergers as a result of extensive due diligence efforts, expertise in such matters, familiarity with the business of Rite Aid and/or Walgreens, and discussions with FTC staff and/or persons knowledgeable about the FTC's ongoing review. Defendants further insisted that any criticism of the deal's viability was flat wrong and not "well informed."

122.   For example, in October 2015, Rite Aid filed a "script" with the SEC regarding the Original Merger that made a point to downplay any antitrust risk based on purported expert knowledge of the situation, stating that after "extensive consultation with anti-trust counsel, and based upon the complementary nature of the market profiles of both companies, and the amount of pharmacy counters in the U.S., we do not believe the combination should cause regulatory concern." The release, which reflected the views of the Rite Aid Board, also refuted the notion that there would be "any reason why this deal wouldn't happen, such as anti-trust issues."

123.   Similarly, on November 8, 2016, Pessina downplayed media reports that attempted to expose the true extent of the regulatory risks the Merger faced:

> *[W]e have a different opinion than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of. . . . And we continue to be very positive in spite of the opinion of certain people who apparently are not particularly well informed*.

- 60 -

124.     He contrasted that doubt with his own "confidence" that the deal would be approved, stating, "***So, just to reassure you, if we say that we are confident, it is because what we know makes us very confident***."   Pessina continued representing this "confidence" in conference calls with investors as late as January 5, 2017, stating, as a basis for this confidence, that Walgreens had exchanged a "lot of information" with the FTC and that the company "had a very good relationship" with the agency.

125.     Similarly, on November 17 2016, Fairweather stated, "***[w]e are very clear***" in reference to his representation, later revealed to be false, that store divestitures would be less than 1,000 to satisfy antitrust regulators, and, like Pessina, dismissed media reports attempting to expose the truth:

> ***nothing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place.  There's lots of stuff in the papers but it is amazing where it comes from.***

Gradwell added that Defendants had "***clarity***" on the issue based on "ongoing discussion with the FTC," among other sources, and refuted the idea that there was any "blocking rationale" at the FTC, again, purportedly based on insider knowledge.

### The Close Temporal Proximity Between
### Defendants' Statements and the Revelation of Their Falsity

126.     Defendants' representations that they had "confidence" that the deal would satisfy antitrust regulators and be approved, as outlined in the Original Merger Agreement, soon before the falsity of those statements was revealed, further bolsters an already compelling inference of scienter.

- 61 -

127.    On January 5, 2017, Pessina told investors and the market with regards to the deal: "we are confident we can deliver for our customers and our shareholders, on all the plans and strategies we have discussed with you."  On that same call, Pessina represented that Walgreens was "clearly making progress" in its discussions with the FTC, and that he "remain[ed] as convinced as ever of the strategic benefits of the proposed Rite Aid transaction."  Similarly, Fairweather stated that Walgreens was "actively engaged in discussions with the FTC" and, based in part on these discussions, reaffirmed Walgreens' 2017 fiscal guidance that included Rite Aid accretion of $0.05 to $0.12 adjusted diluted net earnings per share for the year.  But by the very next day, based on prior discussions, and with access to the same facts available on January 5, Rite Aid's attorneys had privately concluded that "***the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date***."  And on January 20, 2017 – ***barely two weeks*** after Defendants had stressed their "confidence" that the deal would be approved by the FTC as structured based on purported insider knowledge and conversations with regulators – *Bloomberg* reported in an article entitled, "Walgreens Faces U.S. Antitrust Concerns Over Rite Aid Fix," that the FTC was, in fact, unlikely to approve the deal.  The article relayed the concerns of FTC officials that "Walgreens's proposal to sell 865 drugstores . . . doesn't go far enough to preserve competition that would be lost in the tie-up."  Just ten days after this revelation, on January 30, 2017, Rite Aid shareholders were again

- 62 -

shocked to learn of the terms of the Revised Merger Agreement and that the purported

reason for the proposed revisions was that antitrust regulators would not approve the

deal as structured.

## PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

128.     At all relevant times, the market for Rite Aid common stock was an

efficient market for the following reasons, among others:

(a)     Rite Aid stock met the requirements for listing, and was listed and

actively traded on the NYSE, a highly efficient and automated market;

(b)     According to the Company's Form 10-K filed on May 3, 2017, the

Company had more than one billion shares outstanding as of April 17, 2017;

(c)     Rite Aid was qualified to file a less comprehensive Form S-3

registration statement with the SEC that is reserved, by definition, to well-established

and largely capitalized issuers for whom less scrutiny is required;

(d)     As a regulated issuer, Rite Aid filed periodic public reports with

the SEC;

(e)     Rite Aid regularly communicated with public investors via

established market communication mechanisms, including regular disseminations of

press releases on the national circuits of major newswire services, the Internet and

other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     Rite Aid was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period and each of these reports was publicly available and entered the public marketplace; and

(g)     Unexpected material news about Rite Aid was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

129.     As a result of the foregoing, the market for Rite Aid common stock promptly digested current information regarding Rite Aid from publicly available sources and immediately reflected such information in Rite Aid's stock price.  Under these circumstances, all purchasers of Rite Aid common stock during the Class Period suffered similar injury through their purchases of Rite Aid common stock at artificially inflated prices, and, thus, a presumption of reliance applies.

## LOSS CAUSATION

130.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted material information concerning Rite Aid's business and prospects and engaged in a scheme to deceive the market.  By artificially inflating and manipulating the price of Rite Aid stock, Defendants deceived Plaintiff and the Class (as defined herein) and caused them losses when the truth was revealed.

- 64 -

When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, this caused Rite Aid's stock price to fall precipitously as the prior artificial inflation came out of the stock price, including following the January 20, 2017, January 30, 2017, and June 29, 2017 disclosures.  As a result of their purchases of Rite Aid stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

131.    Plaintiff brings this action individually and as a class action on behalf of all purchasers of Rite Aid's publicly traded common stock during the Class Period (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

132.    This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

133.    ***Numerosity***.  The Class is so numerous that joinder of all members is impracticable.  According to Rite Aid's 10-K filing on May 3, 2017, the Company had more than one billion shares outstanding as of April 17, 2017.

134.    ***Commonality***.  There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, but are not limited to, the following:

- 65 -

(a)    whether Defendants violated §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5 by making false and/or misleading statements during the Class Period as alleged herein; and

(b)    whether Plaintiff and members of the Class are entitled to damages and the appropriate measure of those damages.

135.    *Typicality*.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

136.    ***Adequacy of Representation***.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

137.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

138.    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

139.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

- 66 -

1311192_1

## CAUSES OF ACTION

## COUNT I

**Claim for Violations of §10(b) of the 1934 Act and SEC Rule 10b-5
(Against All Defendants)**

140.    Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

141.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or deliberately disregarded, to be misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Rite Aid common stock during the Class Period.

143.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rite Aid stock.

Plaintiff and the Class would not have purchased Rite Aid common stock during the Class Period at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Claim for Violations of §20(a) of the 1934 Act
### (Against All Defendants)

144.     Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

145.     Defendants acted as control persons of Rite Aid within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, participation in and/or awareness of the Company's operations, intimate knowledge of the false and misleading statements made during the Class Period, and/or express right to review proxy statements, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements alleged herein.

146.     Defendants were provided with or had unlimited access to copies of the statements alleged to be misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of those statements or cause those statements to be corrected.

147.    In particular, each member of the Rite Aid Board had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the 1934 Act violations alleged herein, and exercised the same.

148.    As set forth above, Defendants had the ability to exercise control over, and did control, a person or persons who have each violated §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder, by their acts and omissions in connection with the false and materially misleading Class Period statements as alleged herein.

149.    By virtue of these facts, Defendants have violated §20(a) of the 1934 Act and are liable to Plaintiff and the other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in favor of Plaintiff and the Class, and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representatives and Plaintiff's counsel as Class counsel;

B.    Awarding Plaintiff and the Class compensatory damages;

C.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E.      Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the Class demand a trial by jury.

DATED:  December 11, 2017          KAUFMAN, COREN & RESS, P.C.
                                   DEBORAH R. GROSS
                                   (Pa. ID No. 44542)


                                   _____
                                   *s/ Deborah R. Gross*
                                   DEBORAH R. GROSS

                                   Two Commerce Square, Suite 3900
                                   2001 Market Street
                                   Philadelphia, PA 19103
                                   Telephone:  215/735-8700
                                   dgross@kcr-law.com

                                   ***Local Counsel***

- 70 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
MARK J. DEARMAN
CHRISTOPHER GOLD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone:  561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

***Lead Counsel for Plaintiff and the Proposed
Class***

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)

HAGENS BERMAN SOBOL SHAPIRO LLP
KARL P. BARTH
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)

***Additional Counsel for Plaintiff***

- 71 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

JERRY HERING ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff holds 119,776 shares of Rite Aid common stock as of the date of this certification, was a holder of Rite Aid common stock at all relevant times, and has made the following transactions during the Class Period in the common stock of Rite Aid:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

<em>See</em> attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25 day of September, 2017.

JERRY HERING

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/28/2015 | 350 | $8.03 |
| 10/29/2015 | 625 | $7.92 |
| 10/29/2015 | 100 | $7.89 |
| 10/29/2015 | 525 | $7.82 |
| 11/11/2015 | 850 | $7.72 |
| 11/12/2015 | 400 | $7.72 |
| 11/12/2015 | 375 | $7.68 |
| 11/13/2015 | 400 | $7.63 |
| 11/13/2015 | 300 | $7.61 |
| 11/13/2015 | 50 | $7.59 |
| 01/20/2016 | 525 | $7.59 |
| 08/16/2016 | 500 | $7.62 |