## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOUGLAS S. CHABOT *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>WALGREENS BOOTS ALLIANCE,<br>INC., *et al.*,<br><br>        Defendants. | **1:18-cv-2118-JEJ**<br><br>**(Hon. John E. Jones III)**<br><br>**ORAL ARGUMENT REQUESTED** |

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Thomas G. Collins (PA 75896)
BUCHANAN INGERSOLL
 & ROONEY PC
409 North Second Street, Suite 500
Harrisburg, PA 17101
(717) 237-4843
(717) 233-0852 (fax)
thomas.collins@bipc.com


Dated: January 8, 2019

Jonathan D. Polkes (NY 2015527)
Caroline Hickey Zalka (NY 4263448)
Robert S. Ruff (NY 5036587)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
(212) 310-8007 (fax)
jonathan.polkes@weil.com
caroline.zalka@weil.com
robert.ruff@weil.com

Attorneys for Defendants

## **TABLE OF CONTENTS**

Preliminary Statement................................................................1

Statement of Facts ...................................................................3

    A.    Before the Class Period (October 2015–October 2016):
          Walgreens Announces Deal for a Set Price and Warns of
          Regulatory Risk................................................................3

    B.    Class Period (October 2016–April 2017): Walgreens
          Announces Revisions to the Merger Agreement ..................5

    C.    Class Period Ends (June 2017): Merger Replaced with Asset
          Purchase ...........................................................................8

Procedural History ...................................................................8

Question Involved ....................................................................9

Legal Standard .......................................................................10

Argument.................................................................................11

  I.    The Complaint Fails the *Tellabs* Comparative Evaluation .....................11

    A.    Plaintiffs' Theory of Fraud Is Incoherent and Less Compelling
          than the Benign Explanation for Walgreens' Statements ..................11

    B.    Plaintiffs Plead No Logical Motive.......................................14

    C.    Plaintiffs Fail to Plead that Defendants Knew Facts Contrary to
          Their Public Statements .....................................................16

    D.    What Remains Is an Improper Fraud-by-Hindsight Theory
          Based on Temporal Proximity Alone.................................20

  II.    Plaintiffs' Section 20(a) Claim Should Also Be Dismissed....................22

Conclusion ..............................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ...............................................................................17

*Denny v. Barber*,
  576 F.2d 465 (2d Cir. 1978) ..............................................................................21

*In re Digital Island Sec. Litig.*,
  357 F.3d 322 (3d Cir. 2004) ........................................................................10, 16

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ...................................................................15, 16, 19

*Inst'l Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ...........................................................12, 16, 20, 21

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) ........................................................................10, 21

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ...........................................................14, 15, 17, 22

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ..............................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................*passim*

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) .......................................................................10, 19, 21

**Statutes and Rules**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 .................2, 10, 17, 21

Fed. R. Civ. P. 12(b)(6)........................................................................................10

WEIL:\96865828\1\79495.0114

## **Preliminary Statement**

Three Rite Aid shareholders allege they were defrauded by false statements made to inflate Rite Aid's stock price. In a strange twist on the normal securities fraud action, however, these Rite Aid shareholders do not point to statements made by Rite Aid to prop up its own stock price. Instead, they point to statements made by a *different* company, Walgreens.

This novel theory of fraud demands an explanation: Why would Walgreens engage in a fraudulent scheme to prop up the stock price of another company? This is especially puzzling because, in the underlying transaction, Walgreens had agreed to buy Rite Aid for a fixed price; in other words, the market price of Rite Aid stock made no difference to Walgreens in the merger. Furthermore, neither Walgreens nor any of its executives are alleged to have had any financial interest in the market price of Rite Aid shares, and the purportedly false statements are not alleged to have had any beneficial impact on Walgreens' own stock price. Finally, there was no apparent reason for Walgreens to encourage Rite Aid shareholders to harbor false expectations about the likelihood of FTC approval. This is particularly true when, according to Plaintiffs, Walgreens believed such approval was unlikely. The alleged fraudulent scheme appears pointless and the question "why?" leaps off every page of the Complaint.

Under the PSLRA and well-established Supreme Court authority, this case cannot proceed unless Plaintiffs plead with sufficient particularity facts supporting a "strong inference" that Defendants made inaccurate statements with the "intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14 (2007). To test whether a complaint has done so, the Supreme Court requires that courts conduct a "comparative evaluation." *Id.* at 314. Specifically, courts must consider culpable and benign explanations for the defendant's statements, and deny a motion to dismiss "only if" the culpable explanation offered by the plaintiff is "cogent and at least as compelling as" any nonculpable one. *Id.* at 324. The Complaint here fails to clear this hurdle.

The false statements at issue are those that survived the Court's July 11, 2018 decision in *Hering v. Rite Aid Corp.*, No. 15-cv-2440. Of the dozens of statements challenged in *Hering*, the Court dispatched all but five, each of which either expresses the speaker's confidence that FTC approval was obtainable or disputes negative news reports about the FTC review. The comparative evaluation mandated by *Tellabs* requires the Court to weigh the cogency and likelihood of two possible inferences that can be drawn from the Complaint. The first, on which the Complaint depends, is that Walgreens made five fraudulent statements for no discernible purpose.

WEIL:\96865828\1\79495.0114

The second inference, in contrast, is simple and logical: When Walgreens executives continued to engage with the FTC, expressed confidence in the deal, and disputed negative news reports, they did so because they believed—based on what they knew—that regulatory approval was obtainable and the news reports were inaccurate. When feedback from the FTC warranted changes to the merger, Walgreens and Rite Aid made those changes and updated investors. Because this inference is more compelling, the Complaint should be dismissed.

## Statement of Facts

### A.  Before the Class Period (October 2015–October 2016): Walgreens Announces Deal for a Set Price and Warns of Regulatory Risk

On October 27, 2015, Walgreens and Rite Aid announced a merger agreement in which Walgreens would purchase Rite Aid for a set price, $9.00 cash per share. (Doc. 1, ¶ 34). The agreement included a commitment from Walgreens to divest up to 1,000 stores if necessary to obtain FTC approval. (*Id.* at ¶ 37). From that point forward, the merger price was the only price for Rite Aid stock that mattered to Walgreens.

One day later, Walgreens disclosed in its annual report—under the bolded heading "We may not be able to successfully or timely complete the pending acquisition of Rite Aid"—that, "[i]n deciding whether or not to object to the transaction, regulatory agencies have broad discretion," that, "[a]s a condition to their approval of the transaction, these agencies may impose requirements,

3

limitations or costs or require divestitures," and that "we can provide no assurance that we will obtain the necessary approvals or that any such conditions that are imposed would not diminish the anticipated benefits of the transaction or result in the termination of the transaction." (Ex. 1, Oct. 2015 Form 10-K at 9).[*] This warning was repeated or referred to in future quarterly reports (Ex. 3, Oct. 2016 Form 10-K at 11; Ex. 7, Jan. 2017 Form 10-Q at 37; Ex. 11, Apr. 2017 Form 10-Q at 50) and on every investor call challenged in the Complaint (Ex. 4, Oct. 20 Tr. at 3; Ex. 5, Nov. 17 Tr. at 12; Ex. 6, Jan. 5 Tr. at 3; Ex. 10, Apr. 5 Tr. at 3).

On December 11, 2015, Walgreens and Rite Aid disclosed an FTC request for information they had received one day earlier. (Doc. 1, ¶¶ 40–41).

On February 4, 2016, Rite Aid's shareholders approved the merger. (*Id.* at ¶ 25).

On a July 6, 2016 earnings call, Walgreens' CEO Stefano Pessina discussed the company's expectations about when the deal would close and how many stores Walgreens would divest. (*Id.* at ¶ 47). The block quote in the Complaint omits a cautionary statement from Mr. Pessina: "But of course, it doesn't depend on us. The FTC will let us know when they are ready." (Ex. 2, July 6 Tr. at 16).

---

[*] Exhibits are attached to the accompanying Declaration of Jonathan D. Polkes.

**B.     Class Period (October 2016–April 2017): Walgreens Announces Revisions to the Merger Agreement**

On October 20, 2016, Walgreens and Rite Aid announced that, due to the FTC's ongoing review, they had agreed to extend the merger agreement's end date from October 27, 2016 to January 27, 2017. (Doc. 1, ¶ 50). On an earnings call the same day, Mr. Pessina, in response to an analyst's question, expressed confidence the deal would close by early 2017 and disputed unspecified news reports as contrary to Walgreens' views of the deal's prospects. (*Id.* at ¶ 51).

In a statement from the October 20 call not challenged by Plaintiffs, Mr. Pessina explained his view of the FTC process: "[W]e have always been optimistic because we have never seen an attitude from the FTC, which was an absolute negative, of course they were inquiring. They were detailed. They were asking a lot of questions. Sometimes they were taking time to respond, but at the end of the day, I believe we have a good collaboration …. We try to respond to all of their needs. This takes time." (*Id.*)

At a November 17, 2016 conference, Walgreens' CFO George Fairweather expressed confidence the deal would close even though it was taking "a little bit longer than we had thought in the first place," expressed Walgreens' continued belief in the economics of the deal, and stated "[t]here's lots of stuff in the papers but it is amazing where it comes from." (*Id.* at ¶ 56). At the same conference, another Walgreens executive, Gerald Gradwell, updated investors that Walgreens

5

had "enough clarity on what we have to do in terms of remedies with the FTC" to have begun sharing information on to-be-divested pharmacies with potential buyers. (*Id.* at ¶ 57).

Plaintiffs also allege that, at the same November 17 conference, Mr. Gradwell "refuted the idea that there was any 'blocking rationale' at the FTC." (*Id.* at ¶ 84). The Complaint omits Mr. Gradwell's full statement, which explains his logic and cautions investors: "So from our point of view, the process has never stopped, which is quite key, because if there was a blocking rationale the case team would stop working at the FTC. You can never guarantee anything. It still has to go through the commissioners of the FTC but we are slightly further behind where we thought we would be just because the level of detail, but things are progressing well." (Ex. 5, Nov. 17 Tr. at 9).

On a January 5, 2017 earnings call, Mr. Pessina stated that Walgreens would "work at a pace" at which it was "confident" it could "deliver" on its "plans and strategies," and, when asked if Walgreens had a "Plan B" if the merger failed to receive FTC approval, responded that "we have had a very good relationship with the people of the FTC" and that "we are not thinking of a Plan B today." (Doc. 1, ¶ 60).

WEIL:\96865828\1\79495.0114

On January 20, 2017, Bloomberg published an article discussing two anonymous individuals who claimed that "FTC lawyers aren't sold on Walgreen's proposal to sell 865 drugstores" to obtain antitrust approval. (Ex. 8; Doc. 1, ¶ 64).

On January 30, 2017, Walgreens and Rite Aid announced a revised merger agreement that, to account for additional potential store divestitures, reduced the merger price from $9.00 to a range of $6.50–$7.00 per share—depending on how many divestitures the FTC would require. (*Id.* at ¶ 65). As before, the price of Rite Aid to Walgreens was the merger price; the market price of Rite Aid's stock remained irrelevant. The revised merger agreement also extended the agreement's end date to July 31, 2017. (*Id.*). Plaintiffs challenge no statements made on January 30, 2017.

On an April 5, 2017 earnings call, Mr. Pessina expressed continued belief that Walgreens would close the deal and achieve its expected benefits. (*Id.* at ¶ 62). He added, "We are collaborating very well with the FTC." (*Id.*). The Complaint omits cautionary language from Mr. Pessina on the same call, where he advised that "the process of getting clearance for the transaction is taking longer than we expected," and, when asked what would happen if the FTC rejected the proposed divestiture sale, stated "we will review our options." (Ex. 10, Apr. 5 Tr. at 7, 12).

7

### C.     Class Period Ends (June 2017): Merger Replaced with Asset Purchase

On June 29, 2017, Walgreens and Rite Aid announced the replacement of the merger with an asset purchase, in which Walgreens would purchase certain Rite Aid stores instead of merging with Rite Aid. (Doc. 1, ¶ 33). On an earnings call that day, Mr. Pessina explained the decision was due to "changes in the market during the longer than expected Federal Trade Commission review process and the ongoing uncertainty about the potential outcome," and that the new structure attempted to "address all the substantive regulatory points raised about the original transaction." (Ex. 12, June 29 Tr. at 6–7). Plaintiffs do not challenge this statement.

### Procedural History

Plaintiffs' counsel previously represented a different Rite Aid investor in a related action, *Hering v. Rite Aid Corp.*, No. 15-cv-2440. Hering's amended complaint alleged that, between October 27, 2015 and June 28, 2017, Rite Aid and Walgreens made dozens of misstatements about the FTC's review of the merger. (15-cv-2440, Doc. 83, ¶¶ 63–101). On July 11, 2018, the Court dismissed all of Hering's allegations except as to the five Walgreens statements challenged here. (15-cv-2440, Doc. 111).

On August 24, 2018, the Walgreens defendants moved for judgment on the pleadings against Hering because the Court's July 11 decision had eliminated Hering's standing. (15-cv-2440, Doc. 126). On September 6, 2018, the three

8

plaintiffs who later filed this action jointly moved to intervene in *Hering*. (15-cv-2440, Doc. 132). On October 24, 2018, the Court granted the Walgreens defendants' motion for judgment on the pleadings, denied the intervenors' motion, and noted that the intervenors were "free to bring their allegations in a new action." (15-cv-2440, Doc. 149, p. 14).

Plaintiffs, represented by Hering's counsel, filed this action on November 2, 2018. (Doc. 1). Their Complaint asserts claims based solely on "the specific statements that this Court ruled were actionably false and misleading" in *Hering*. (*Id.* at ¶ 8). Those include "statements downplaying or disputing contrary reports from journalists that the [FTC] review was not going well, made on October 20, 2016, and November 17, 2016, as well as statements expressing confidence based on 'inside' knowledge of the review, made on October 20, 2016, November 17, 2016, January 5, 2017, and April 5, 2017." (15-cv-2440, Doc. 111, p. 29 & n.4). Plaintiffs expressly do not challenge "the statements found as non-actionable" in *Hering*. (Doc. 1, ¶ 8).

## <u>Question Involved</u>

Whether the Complaint alleges facts sufficient to draw a strong inference of fraud that is cogent and as compelling as any nonculpable inference.

## Legal Standard

The Supreme Court's *Tellabs* decision "remove[d] any doubt the PSLRA's scienter pleading requirement is a significant bar to litigation." *Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007). *Tellabs* "prescribed a three-step process for considering a motion to dismiss in a § 10(b) action." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016). In step one, "as with all motions under Rule 12(b)(6), [the Court] must 'accept all factual allegations in the complaint as true.'" *Id.*

In step two, the Court "'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Id*. The Court may take judicial notice of SEC filings. *In re Digital Island Sec. Litig.*, 357 F.3d 322, 325 (3d Cir. 2004).

Finally, in step three, the Court must determine "whether the pleaded facts give rise to a 'strong' inference of scienter." *OFI*, 834 F.3d at 490. To be "strong," the plaintiff's inference must rest on specific facts pleaded with "particularity," 15 U.S.C. § 78u-4(b)(1), (2), and must pass the "comparative evaluation" mandated by *Tellabs*. 551 U.S. at 314. That evaluation requires the Court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as

WEIL:\96865828\1\79495.0114

inferences favoring the plaintiff." *Id.* at 323–24. The plaintiff's inferences must be more than merely "reasonable" or "permissible"—they must be "strong in light of other explanations." *Id.* at 324. The Court may deny the motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## Argument

## I.   The Complaint Fails the *Tellabs* Comparative Evaluation

### A.   Plaintiffs' Theory of Fraud Is Incoherent and Less Compelling than the Benign Explanation for Walgreens' Statements

Plaintiffs' claim—that Walgreens executives lied to inflate the stock price of a different company, Rite Aid—is a sleight-of-hand variation of the normal securities fraud action, in which investors allege that management of the company they invested in fraudulently propped up *that company's* stock price. The Complaint never acknowledges this twist, which compels the question: Why would Walgreens executives lie to Rite Aid shareholders about the FTC's review?

The Complaint provides no logical answer. It makes no effort to explain why Walgreens executives would care about the market price of Rite Aid stock at all, much less enough to commit fraud in an effort to influence it. Throughout the class period, only one price for Rite Aid mattered to Walgreens—the merger price. The Complaint does not allege that Walgreens executives owned or sold Rite Aid stock, or otherwise had any financial interest in the market price of Rite Aid's stock. The

11

Complaint also does not allege that the statements by Walgreens executives beneficially impacted the price of *Walgreens* stock. Indeed, the Complaint fails to articulate *any* benefit *Walgreens* executives realized from supposedly inflating *Rite Aid's* stock price.

As to the alleged scheme, the Complaint offers no plausible reason why Walgreens executives would encourage Rite Aid shareholders to harbor false expectations about FTC approval, let alone why those executives would continue to pour resources into obtaining approval (Doc. 1, ¶¶ 77, 79), if they believed such approval was unlikely. The Complaint is loaded with "omissions and ambiguities [that] count against inferring scienter" under *Tellabs*. *Inst'l Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009).

The pleaded facts support a simple, more compelling, and benign inference under *Tellabs*. When Walgreens announced the merger, it expected the deal would receive FTC approval. (Doc. 1, ¶ 34). But at the same time, and throughout the class period, Walgreens cautioned investors that "we can provide no assurance" of FTC approval (Ex. 1, Oct. 2015 Form 10-K at 9; Ex. 3, Oct. 2016 Form 10-K at 11) and regularly updated investors about merger developments and management's view of the FTC process. In December 2015, Walgreens disclosed its receipt of the FTC's request for information one day after receiving it. (Doc. 1, ¶¶ 40–41). In October 2016, Walgreens announced an extension of the deadline to complete the

merger and explained the FTC was "asking a lot of questions" and "taking time to respond." (*Id.* at ¶ 50–51). In October and November 2016, when Walgreens executives disputed news reports that the FTC's review was going poorly (*id.* at ¶¶ 51, 56), they did so because they believed the reports were inaccurate. On January 5, 2017, when Walgreens' CEO said "we are not thinking of a Plan B today" and cited a "very good relationship" with the FTC (*id.* at ¶ 60), he was answering an analyst's question truthfully.

By the end of January, expectations had changed about the number of divestitures the FTC would seek, so the parties revised the merger agreement. (*Id.* at ¶ 61). Over two months later, in April, while expressing continued belief in the deal, Walgreens' CEO informed investors that the FTC's review was "taking longer than we expected" and that "we will review our options" if the FTC rejects the proposed antitrust remedy. (Ex. 10, Apr. 5 Tr. at 7, 12). And nearly three months later when Walgreens and Rite Aid replaced the merger with an asset purchase, in June 2017, it was not a revelation that Walgreens had been lying about a doomed FTC review all along—it was a revision compelled by "changes in the market during the longer than expected Federal Trade Commission review process and the ongoing uncertainty about the potential outcome," as Walgreens' CEO explained. (Ex. 12, June 29 Tr. at 6–7). The benign explanation for all of these statements is simple: Walgreens sought to keep its investors (not Rite Aid's

WEIL:\96865828\1\79495.0114

investors) informed of management's current view of the FTC process, revise the deal as necessary to obtain FTC approval, and disclose any revisions in real time.

This inference is cogent and, critically under *Tellabs*, more compelling than Plaintiffs' theory, which requires the Court to suppose that—in five instances out of countless statements about the deal, for no discernible benefit to their employer, their shareholders, or themselves—Walgreens executives chose to embark on an illegal scheme to mislead another company's shareholders. The Complaint pleads no basis for such a far-fetched inference.

## B.    Plaintiffs Plead No Logical Motive

A plaintiff's failure to "demonstrate that the individual defendants had a motive for their wrongful conduct" is "significant" to the "holistic review" of scienter *Tellabs* requires. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013). The Complaint offers three illogical explanations why Walgreens executives had a "motive" to commit the alleged irrational fraud.

First, Plaintiffs assert that Walgreens "misled investors to gain [Rite Aid] shareholder approval of the deal." (Doc. 1, ¶ 74). Nonsense. *All* of the alleged misstatements occurred *after* Rite Aid shareholders approved the merger in February 2016. (*Id.* at ¶ 25). Regardless, the "desire to complete [a] transaction" is a motive "generally possessed by most corporate directors and officers" and thus

14

does not show scienter. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004).

Second, Plaintiffs claim that Walgreens misled investors because "criticism of the deal's viability … threatened to tarnish Pessina's strong deal-making reputation." (Doc. 1, ¶ 74). But the Complaint alleges no facts in support of this inference, which makes no sense even as speculation. If the motive was to protect Mr. Pessina's "deal-making reputation," overstating the likelihood of deal completion would *magnify* the harm to Mr. Pessina's reputation if the deal failed. Instead, the logical approach would have been to warn the market that factors beyond his control—namely, the FTC's review—could jeopardize the deal (as Walgreens did).

Finally, the Complaint states that "Defendants agreed to reduce the Original Merger Consideration by up to $2.6 billion with no commensurate benefits to Rite Aid shareholders." (*Id.* at ¶ 76). That allegation is nonsensical. It has nothing to do with the alleged fraud and is likely left over from the *Hering* complaint in which Rite Aid investors sued their own fiduciaries. (15-cv-2440, Doc. No. 83, ¶ 115).

Thus, the Complaint fails to "demonstrate that the individual defendants had a motive for their wrongful conduct"—a "significant" strike against a culpable inference under *Tellabs*. *Rahman*, 736 F.3d at 245.

WEIL:\96865828\1\79495.0114

### C.     Plaintiffs Fail to Plead that Defendants Knew
####        Facts Contrary to Their Public Statements

With no logical motive, Plaintiffs theoretically could plead scienter by

alleging "facts and circumstances that would support an inference that defendants

knew of specific facts that [were] contrary to their public statements." *GSC*

*Partners*, 368 F.3d at 239. That said, the Third Circuit has emphasized that

*Tellabs*' comparative analysis "ultimately rest[s] not on the presence or absence of

certain types of allegations but on a practical judgment about whether, accepting

the whole factual picture painted by the Complaint, it is at least as likely as not that

defendants acted with scienter." *Avaya*, 564 F.3d at 269. It is difficult to imagine

what "facts and circumstances" could support the "whole factual picture painted"

by the Complaint of an irrational and purposeless scheme.

The Complaint asserts that Defendants "recklessly disregarded" contrary

nonpublic facts. (Doc. 1, ¶ 63). Importantly, "recklessness" in the Section 10(b)

context is a state of mind that "approaches … conscious deception," not some

heightened form of negligence. *Digital Island*, 357 F.3d at 332. Indeed, the

purpose of "[a]llowing [p]laintiffs to plead recklessness" is not to soften Section

10(b)'s scienter requirement, but to "discourage[] deliberate ignorance and

prevent[] defendants from escaping liability solely because of the difficulty of

proving conscious intent to commit fraud." *Id.* Thus, "[a] reckless statement is one

involving not merely simple, or even inexcusable negligence, but an extreme

16

departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Rahman*, 736 F.3d at 242 n.4.

To meet this demanding standard, securities plaintiffs typically rely on company sources—such as internal documents or former employees—to allege that defendants possessed nonpublic information that contradicted their public statements. *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) ("a complaint can meet the [PSLRA's] pleading requirement" by pleading "sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs"); *see also Rahman*, 736 F.3d at 244 n.8 (if a complaint lacks "documentary evidence such as internal memoranda, 'reliance on confidential sources to supply the requisite particularity … assumes a heightened importance'"). But Plaintiffs allege no such sources here.

Instead, the Complaint's claim that Defendants had contrary nonpublic information rests principally on two vague assertions that collapse under scrutiny. First, Plaintiffs allege that, "[f]rom late April to August 2016," the FTC expressed concerns about the merger's "anticompetitive effects" (Doc. 1, ¶ 63(a)) and that "Defendants were specifically informed by the FTC that the Original Merger would 'require a remedy'" (*id.* at ¶ 80). But the suggestion that Walgreens concealed this information is absurd. The publicly filed merger agreement allowed

17

for divestitures (*id.* at ¶ 37), Walgreens warned investors when it announced the deal that the FTC might "require divestitures" (Ex. 1, Oct. 2015 Form 10-K at 9), and before the alleged class period began, Walgreens announced that, after "discussions with the FTC staff," it was "exploring potential divestiture remedies" (Doc. 1, ¶ 48). The FTC's antitrust concerns were no secret.

Second, Plaintiffs assert the FTC had "determin[ed] that it was unlikely to approve the Original Merger or the Revised Merger as then-constituted" (*id.* at ¶ 80) and "indicated" as much to Walgreens (*id.* at ¶ 63(e)). The sole factual allegation related to this assertion is the January 2017 Bloomberg article discussing anonymous individuals who claimed that "FTC officials" thought Walgreens' divestiture proposal "doesn't go far enough." (*Id.* at ¶¶ 64, 86). To start, the January 20 article pre-dated the January 30 revised merger and so could not possibly have been reporting the FTC's feedback on it. Also, the article reported concerns with the proposed divestiture package (Ex. 8); it did *not* report that the FTC was categorically "unlikely to approve the deal," as the Complaint suggests (*id.* at ¶¶ 64, 86). Moreover, no pleaded facts support the inference that Walgreens received the reported FTC feedback before Mr. Pessina's January 5 statements, as opposed to after them.

Apart from the aforementioned two vague and unsupported assertions, the Complaint offers two more allegations, neither of which addresses what Walgreens

executives knew. First, Plaintiffs point to advice *Rite Aid's* legal advisors gave *Rite Aid's* board of directors. (Doc. 1, ¶ 63(b); Ex. 9, Mar. 2017 Proxy at 66). Obviously, whatever statements *Rite Aid's* lawyers may have made to *Rite Aid's* board have no bearing on what *Walgreens* executives knew. These allegations "fail[] to link the declarant of the challenged statement with facts that might contradict his statement." *Winer*, 503 F.3d at 332. Furthermore, these alleged statements did not concern whether the FTC would *ever* approve the merger, but rather whether the FTC would approve it by January 27, 2017, the merger agreement's then-existing end date. (Doc. 1, ¶ 63(b)).

Second, Plaintiffs point to Mr. Pessina's and Mr. Fairweather's senior positions and involvement in the FTC review process. (*Id.* at ¶ 76). But scienter allegations based on a defendant's "position in the company" do not "give rise to a strong inference" that the defendants "knew of or recklessly disregarded particular" information. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006).

Accordingly, Plaintiffs fail to plead that Walgreens' executives "knew of specific facts that [were] contrary to their public statements." *GSC Partners*, 368 F.3d at 239.

### D.	What Remains Is an Improper Fraud-by-Hindsight Theory Based on Temporal Proximity Alone

With no plausible explanation for the alleged fraud, Plaintiffs rest their entire burden of satisfying *Tellabs* on the "close temporal proximity" between the challenged statements and changes to the deal. (Doc. 1, ¶ 76). In *Hering*, the Court held that this allegation supported "a strong inference at least of recklessness." (15-cv-2440, Doc. 111, p. 30). But the *Hering* briefing did not address the *Tellabs* comparative evaluation presented here. The *Hering* complaint presented a different theory than the Complaint here, alleging that Walgreens *and Rite Aid* "[t]ogether … worked to foist [an] unfair deal on Rite Aid shareholders" to "secure lucrative benefits" for Rite Aid insiders. (15-cv-2440, Doc. 83, ¶ 112). Now that Rite Aid is gone from the case, temporal proximity's failure to explain the alleged irrational fraud is brought into stark relief.

While temporal proximity can *support* an inference of scienter, the Third Circuit stressed in *Avaya* that, as with any pleading evaluated under *Tellabs*, "[t]he inferential significance of any single allegation can be determined only by reference to all other allegations." 564 F.3d at 273. Indeed, in *Avaya*, the Third Circuit credited a temporal proximity allegation where plaintiffs "primarily rel[ied] on the representations of confidential witnesses," *id.* at 260, pleaded a series of additional bases for scienter, *id.* at 272, and alleged a "plausible" motive, *id.* at 277–78.

20

Here, unlike in *Avaya*, temporal proximity stands alone. The Complaint accuses Defendants of a pointless fraud and pleads no plausible motive for committing it, no facts showing what contrary information Defendants possessed, and no confidential witnesses or other internal sources that refute Defendants' public statements. Temporal proximity cannot overcome these deficiencies here, or it would in every case. That would undermine the PSLRA's particularity requirements, the holistic review that *Tellabs* requires, and the Third Circuit's concordant "hesitan[ce] to formulate categorical rules about the sufficiency of different types of allegations." *Avaya*, 564 F.3d at 272.

More fundamentally, Plaintiffs cannot "simply seize[] upon disclosures made in later … reports and allege[] that they should have been made in earlier ones." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.). That is "fraud by hindsight," a pleading practice the Third Circuit has "long rejected." *OFI*, 834 F.3d at 497. For example, in *Winer*, where a company reversed its assessment of a transaction "[w]ithin weeks" of making positive statements, the Third Circuit held that "the most plausible inference was that [the company] revised its cost estimates in response to new information and to negotiations during the intervening time period." 503 F.3d at 331. Nothing in the Complaint supports a different result here.

21

Finally, it is important to clarify the timing underlying the Court's previous observation that Defendants "seemed to double-down and disputed reports that the transaction may falter" after "the FTC raised concerns and the original terms of the merger needed to be revised." (15-cv-2440, Doc. 111, p. 30). In Mr. Pessina's statements during the April 5, 2017 earnings call—the *only* challenged statements that postdate the revision of the merger agreement in January—he did not dispute news reports or claim inside knowledge. (Doc. 1, ¶ 62). On the contrary, in remarks omitted from the Complaint, Mr. Pessina stated "there is no doubt that the process of getting clearance for the transaction is taking longer than we expected" and that if the FTC rejects the proposed divestiture sale, "we will review our options." (Ex. 10, Apr. 5 Tr. at 7, 12).

## II.    Plaintiffs' Section 20(a) Claim Should Also Be Dismissed

Because Plaintiffs' Section 10(b) claim fails, their Section 20(a) claim also fails. *Rahman*, 736 F.3d at 247.

## Conclusion

The Court should grant Defendants' motion to dismiss.

Dated: January 8, 2019

s/ Jonathan D. Polkes
Jonathan D. Polkes (NY 2015527)
Caroline Hickey Zalka (NY 4263448)
Robert S. Ruff (NY 5036587)

Thomas G. Collins (PA 75896)
BUCHANAN INGERSOLL
 & ROONEY PC
409 North Second Street, Suite 500
Harrisburg, PA 17101
(717) 237-4843
(717) 233-0852 (fax)
thomas.collins@bipc.com

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
(212) 310-8007 (fax)
jonathan.polkes@weil.com
caroline.zalka@weil.com
robert.ruff@weil.com

Attorneys for Defendants

WEIL:\96865828\1\79495.0114

## <u>CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMIT</u>

I certify that the foregoing brief includes 4,999 words, as measured by the word-processing system used to prepare the brief, and that the brief therefore complies with the word-count limit described in Local Rule 7.8(b)(2).

Dated: January 8, 2019

      s/ Jonathan D. Polkes      

Jonathan D. Polkes
